## FLOWER v. UNITED STATES.

### (Circuit Court of Appeals, Fifth Circuit. June 2, 1902.)

### No. 1,153.

1. CRIMINAL LAW—CONFESSIONS—CORROBORATION AS TO CORPUS DELICTI.

A defendant in a criminal case cannot be convicted on his extrajudicial confession unless it is corroborated in a material and substantial manner by evidence aliunde as to the corpus delicti. Such evidence, however, need not be such as to alone establish that fact beyond a reasonable doubt, but it is sufficient if, when considered in connection with the confession, it satisfies the jury beyond a reasonable doubt that the offense was committed, and that the defendant committed it

2. SAME—EVIDENCE CONSIDERED.

Evidence considered, and *held* sufficient, when considered in connection with defendant's confession, made to different persons, to sustain a verdict finding him guilty of embezzlement of the funds of a national bank of which he was paying teller.

In Error to the Circuit Court of the United States for the Eastern District of Louisiana.

Lionel Adams, for plaintiff in error.
W. W. Howe, for the United States.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

McCORMICK, Circuit Judge. Samuel Flower, the plaintiff in error, was indicted on May 20, 1901, for that, being paying teller of the Hibernia National Bank, he did on May 8, 1901, embezzle $36,000 of its moneys and funds, and on April 15th of the same year did abstract, take, carry, and send away $36,000 of other moneys and funds belonging to said bank. While, in conformity to strict pleading, the money charged to have been abstracted is described as "other" than that embezzled, both counts refer to, and are intended to cover, one and the same transaction. Flower in due course having been tried, convicted of embezzlement, and sentenced to be imprisoned in the United States penitentiary at Atlanta, Ga., thereafter, upon his application for a writ of error, was allowed to have his case reviewed before this court, and a supersedeas and stay of proceedings granted pending the determination of the same. The contention of the plaintiff in error is that, independent of his confession, there was no satisfactory or sufficient proof at the trial to establish the corpus delicti, and that, therefore, substantial error was committed, to his great damage, in the action of the court refusing a peremptory instruction directing his acquittal. The true basis of this contention appears somewhat obscurely in the requested charge the refusal of which is complained of in the second assignment of error. The charge requested is taken almost literally from the text of Wharton's work on Criminal Evidence (section 325), where the language is:

"A corpus delicti, the proof of which is essential to sustain a conviction, consists of a criminal act, and to sustain a conviction there must be proof of the defendant's guilty agency in the production of such act. With respect to the former of these, it is the established rule that the facts which

¶ 1. See Criminal Law, vol. 14, Cent. Dig. §§ 1225, 1226.

are the basis of the corpus delicti form a distinct ingredient in the case of the prosecution, to be established beyond a reasonable doubt."

In the requested charge the words of Wharton's text, "respect to the former of these," are substituted by the words, "reference to the commission of the criminal act," making the requested charge in full read as follows:

"The corpus delicti, the proof of which is essential to sustain a conviction, consists of a criminal act, and to sustain a conviction there must be proof of the defendant's guilty agency in the production of such act. With reference to the commission of the criminal act, it is the established rule that the facts which are the basis of the corpus delicti form a distinct ingredient in the case of the prosecution, to be established beyond a reasonable doubt."

Counsel for the plaintiff in error contends that the body of the crime in this case which it is necessary to prove is that the embezzlement itself had been committed by some one within three years prior to the finding of the indictment, and that both of these elements of the corpus delicti in this case must be shown by proof independent of the extrajudicial confessions of the accused, and beyond a reasonable doubt. As opposed to this view, the trial court appears to have adopted the doctrine that the law in this country is that a defendant in a criminal case cannot be convicted upon his confession, unless that confession is corroborated in a material and substantial manner so far as concerns the fact that the offense in question has actually been committed by some one; and unless the jury, after being satisfied that the confession is corroborated in the manner just stated, and upon considering the entire case, including the confession, is satisfied beyond a reasonable doubt that the offense was committed, and that the defendant committed it, the jury cannot convict; and proceeded to charge the jury substantially that this criminal charge involves the propositions (1) that the embezzlement has been committed by some one, and (2) that the defendant (the plaintiff in error) is the person who committed the crime, and then said:

"The fact that a crime was committed is called by the lawyers the 'corpus delicti.' In this case the corpus delicti is that some one embezzled * * * the funds of the bank, and it is for you to decide whether, outside of the confessions of the defendant, you find material and substantial corroboration of his confessions as to the fact that some one embezzled * * * the funds of the bank. You are not to make the mistake of supposing that you are required to find outside of the confessions full proof that some one embezzled * * * the funds of the bank, nor are you required to find that the government has proven the defendant guilty of the charges against him outside of his confessions and without taking his confessions into consideration. All that is required on this branch of the case, as I have said before, is for you to find that outside of the confessions there is substantial and material corroboration of the confessions as to the question that some one embezzled * * * the funds of the bank. If you find that there is such corroboration outside of the confessions, then you will consider the confessions, together with all the other evidence in the case; and if, upon the consideration of the whole evidence, which would then include the confessions, you are satisfied beyond a reasonable doubt that the defendant is guilty, you are then bound to so find; while, on the contrary, if a reasonable doubt of his guilt then arises in your minds, you should then acquit him. On the question whether the confessions are corroborated as to the corpus delicti,--that is, as to whether some one committed the offenses charged,--

as well as on all other points in the case, you are to recollect and carefully consider all of the evidence."

All of the evidence substantially has been brought up by the bill of exceptions; and it appears therefrom that on the 8th day of May, 1901, the plaintiff in error was the paying teller of the Hibernia National Bank, in the city of New Orleans, and that on that day a duly appointed and commissioned examiner of national banks of this district was in the city for the purpose and engaged in the work of examining the national banks located here; that about the hour of 2:30 p. m. Mr. Flower asked one F. M. Folger, who was on duty that day at the Hibernia Bank as a special bank detective and guard, to see if he could get large denominations of bills for bills of small denominations from the New Orleans National Bank to the amount of $40,000. On the presentation of this request by Folger, the proper authorities of the New Orleans National Bank stated that they could not do so, which was duly reported to Mr. Flower by Mr. Folger. Mr. Flower then asked Mr. Folger to see the Louisiana National Bank, stating that he desired to exchange a sealed package of silver certificates amounting to $40,000. Folger saw the paying teller of the Louisiana National Bank, who said he could make the exchange in clearing house certificates. Upon that being reported to Mr. Flower, he gave Folger a sealed package purporting to contain $40,000. It was a government package, and labeled 4,000 ten-dollar bills,—$40,000. Mr. Folger took this package to the Louisiana National Bank, and in exchange therefor obtained eight clearing house certificates, of the denomination of $5,000 each, making a total of $40,000. This happened between 2:30 o'clock and 3 o'clock p. m., before the banks closed, on the 8th day of May, 1901. At 3:21 p. m. that day the bank examiner started an examination of the Hibernia National Bank, and on his examination of the department of the paying teller (Mr. Flower's department) found that Mr. Flower had all the cash on hand to correspond with the general book of the bank. In this amount of cash on hand was included $55,000 of what is called clearing house certificates, which were treated and accepted as cash, and included the eight certificates procured by Folger. The examination was thorough, and in all respects satisfactory to the examiner. The same examiner had made semiannual examinations of this bank and of this paying teller's department from the time of his appointment, in 1898, having made, in all, five examinations previously to this one, made on May 8, 1901, and on each occasion had found the cash in the hands of the paying teller to correspond with the general book of the bank, and the condition of the paying teller's department to be in all respects satisfactory. Some time between 3 and 4 o'clock in the afternoon of that day the witness Richard M. O'Brien found at his house, when he returned home, the following letter:

"Hibernia National Bank.

"New Orleans, La., ———, 190—.

"Mr. R. M. O'Brien—Dear Sir: This request will appear to you preposterous, but to me it is a matter of life itself. I am in an awful position. I have speculated with the bank's money to the extent of $36,000,

but can recover a part or all in time. The bank examiner will be here this evening at 3 o'clock, and of course I will be caught up with. The request that I make to you is that if I could only have the use of that much till tomorrow morning I would be absolutely safe, and could explain more fully to you about the whole matter and return to you the amount. My dear little wife went over to the Pass this morning to ask Capt. Menge to do this for me; he is a friend of my family. But when I let her go this morning I did not expect the examiner so soon, so I just telegraphed her that it was too late, as she would not be in time. My dear sir, just the use of $36,000 for a few hours would make such a difference to her and myself, and God will bless you for the act and my dear ones, my wife and mother, will kneel and pray for your happiness. There is good reason to believe that I will recover this amount if I had further time, and if I had it till to-morrow it would save me. May God in his mercy soften your heart, and let you grant my request. Dear sir, it is for such a short space of time I need it; but, oh, how important to me! In case you are indignant at my request, I will get my punishment this evening. So thanking you for your patience, I remain,

"Very respectfully and humbly,

"[Signed]                                           Sam Flower."

"P. S. Seeing you in the bank to-day, it come to me that there might be a possible chance of your helping me; it was like an inspiration from Above."

O'Brien did not advance the money as requested in the letter, but on the same day sent a memorandum to the cashier of the Hibernia National Bank, Mr. Palfrey. On the morning of the 9th of May, about half past 9 o'clock, the witness J. W. Castles, then president of the Hibernia National Bank, went to the bank at his usual time, about half past 9 o'clock, and the cashier showed him the memorandum received from Mr. O'Brien. After reading it, the president walked around to the paying teller, taking with him the receiving teller, Mr. Surgi, and told Mr. Flower to turn over his cash to Mr. Surgi and take a vacation. The president then went back to his desk. In a few minutes afterward Mr. Flower came back, and the president said to him, "Sam, where are you going?" Sam said, "I am not going anywhere." He took his hat and left, and walked out of the bank. Before Mr. Flower had been directed to take his vacation and turn over his cash to Mr. Surgi, Mr. Folger had called on Mr. Flower for the eight certificates to be carried back to the Louisiana Bank, agreeably to the promise made upon obtaining them the evening before, and, having received them, had taken them to the Louisiana National Bank to exchange for the package of bills upon which they had been advanced, and, having made the exchange, he returned with the package to the Hibernia National Bank, and delivered it to Mr. Surgi, who was by that time acting as paying teller at the Hibernia Bank. Mr. Surgi, having no use for such a bundle in his paying teller's cage, took it back to the safe, and committed it to the custody of the cashier, Mr. Palfrey. On this morning (May 9, 1901) the witness J. H. Menge received a telephone message from Mrs. Flower, or some member of the family, stating that Sam was in trouble. Thereupon the witness went out to the house, where, he testifies—

"Sam told me what his trouble was; that he was short in the bank thirty-five or thirty-six thousand dollars; and I advised him to send around and see the president of the bank, and told him that I was going down

town, and would stop there and see him, and tell him the circumstances, and get him to go up and see Sam right away. I met Mr. Castles on the street, and stated the case to him, and he said he would go immediately to see Sam himself,—to his house on Canal street. This interview with Mr. Castles occurred about one o'clock on Canal street, about one square from the Hibernia Bank, near the Germania Bank."

The witness Castles testifies that on the 9th, after his turning the paying teller's cage over to Surgi as the acting paying teller, time went along until about 1 o'clock,

—"When I started to the Boston Club for lunch. I met Mr. Menge on Canal street. He said, 'Have you seen Sam?' I said, 'Sam who?' He said, 'Sam Flower.' I said, 'No, what does he want?' He said, 'Don't you know he is short?' I said, 'No; how much is he short?' He said, 'He is short about thirty thousand dollars.' Mr. Menge gave me Mr. Flower's address, and I took the car and rode out to his house. I rang the bell and went in. Mr. Flower opened the door, and showed me into his parlor or sitting room. I said, 'Sam, sit down and tell me the whole truth now.' So he sat down. I didn't suggest to him that it would be better for him to make the statement. I made him no promise at this time of any kind. He said he was short $36,000; that the way he had covered it up was that he had changed the label on a 4,000-dollar government package to a 40,000-dollar package by taking off that label and pasting on an old label of $40,000, which made the exact figure of $36,000 which he was short. I said, 'Sam, is that all?' He said, 'Yes, that is all.' I said, 'How much of this money have you got?' He said, 'I haven't got any of it at all; it is all gone.' He took out two dollars, and said, 'That is all I have got in the world.' I said, 'Have you got any of this money anywhere?' He said, 'No.' I said, 'What did you do with it?' He answered, 'I sent it to a man in New York by the name of J. Overton Payne to speculate for me.' I said, 'How did you send it?' He answered, 'I sent it by mail.' Then his mother and wife came in and said they wanted to know what I was going to do. I said I was going to do my duty,—report it to the board."

Further on in his examination this witness testified that:

"Flower stated that he was sending the money to J. Overton Payne, a stockbroker in New York; that Payne had led him to believe he could make a large amount of money by so doing; that he had telegraphed Payne that day asking assistance, and that when he got the telegram he would send it to me. He said he got this money at various times and in different amounts, and that the last was $5,000, about two or three weeks before the 9th of May. This money was the property of the Hibernia National Bank, and it was in the custody of Mr. Flower, as paying teller of the bank."

From the time the package of bills referred to in the testimony left the possession of the plaintiff in error on the afternoon of May 8th, when he handed it to the witness Folger, its custody and care is fully shown by the testimony of the different persons into and through whose custody it passed, so as to exclude all doubt as to its having been kept in the exact condition that it was in when the plaintiff in error parted with it, up to the time, in the evening of May 9th, when the package was produced by Mr. Palfrey, and in his presence, and in the presence of Mr. Pool, the auditor of the bank, and of Mr. Druhan, the general bookkeeper, and of Mr. De Sassoure, the bank examiner, was examined as to its outside appearance, its seals and labels opened, and the contents counted, and in all respects its condition and contents corresponded to and attested the statements of

the plaintiff in error made in his conversation with Mr. Castles at noon that day. On the next day Mr. Castles received from the plaintiff in error the following:

"May 10th.

"Mr. Castles—Dear Sir: I enclose telegram from Mr. Payne. I presume the telegraph company made mistake in names. It only come about 5 o'clock this morning. I am so sorry it does not contain better news, but possibly his letter will bring better news. I trust you may see fit to read the inclosed letter, and also read it to the board. I have been waiting for daylight so I could see to write it. Thanking you for your gentleness to me and my dear ones yesterday when you were here, I remain, very humbly,

"[Signed]                                  Sam Flower."

[Copy of Telegram.]

"Received at New Orleans, La., S. W. Corner Gravier and St. Charles Sts., 2:39 a. m.

"2–1. N. Y. IT. ON. 15 Collect.                                    (0880)

"New York, May 9th, 1901.

"Mrs. A. Flawet, 3938 Canal St., New Orleans, La.: Severely caught in the panic today on all long stock; will write fully to-night.

"[Signed]                                  J. O. Paull.

"2:39a."

[Letter.]

"New Orleans, May 10th, 1901.

"Mr. J. W. Castles, President, and Gentlemen of the Board of Directors: I write this humble plea, hoping that when you are about to decide my fate that the Almighty God above us may temper your decision with mercy and pity. If I were given a chance to redeem myself, I feel most confident that in time I could repay a large portion of the money I have taken, if not all. Of course, I don't know how exactly; but I think I have a few friends who might help me to a small extent, possibly three or four thousand dollars; and, even if they did not, I would work, oh! so hard, to repay you. I am young, and only too glad to work; and who knows? Perhaps I may work it out in a few years. My mental suffering has been and is and will be a terrible punishment. But if you, gentlemen, decide that I am to be prosecuted (and God soften your hearts to prevent that) it would be awful. I have, dear sirs, a devoted mother who is to a large extent dependent upon, and a loving wife who is entirely dependent upon, me. What could they do if I were taken from them? My God, gentlemen, be merciful, and give me the chance to redeem myself for the sake of my loved and loving ones. Is my prayer to God and you. Very humbly,

"[Signed]                                  Sam Flower."

We have detailed with probably more than necessary fullness the sequence of the transactions had on May 8th and 9th, because, in our view, they not only strongly corroborate the ample confessions made by the plaintiff in error, but, apart from those confessions, and allowing them only the office of exciting inquiry, so as to produce the prompt dismission of the plaintiff from his active duties, the turning of his paying teller's cage, funds, and work over to another, and later in the day the examination of the package of bills involved in the transaction, the facts established by the direct proof of unimpeached and unimpeachable witnesses hardly leave room for a reasonable doubt as to the commission within not more than six months before May 8, 1901, of the offense charged and as to the person of the offender, and, when taken in connection with the confessions themselves, the whole proof illustrates the soundness and the propriety of the guarded and accurate instruction which the trial judge gave the jury.

The rule so strenuously urged on behalf of the plaintiff in error had its origin at a time when many offenses were punished capitally, and was first applied in cases where the offense charged was murder or other capitally punished felonious homicide, and was so established as a necessary caution against inflicting the last extreme of punishment upon one accused of a crime which had never been committed; and it took its first form in the expression that "the accused should not be convicted unless the death be first distinctly proved, either by direct evidence of the fact or by inspection of the body," on which Mr. Starkie remarks that it is a rule warranted by melancholy experience of the conviction and execution of supposed offenders charged with the murder of persons who survived their alleged murders. Mr. Bishop says:

"This doctrine, requiring a special directness and clearness of the evidence to the fact of there having been a crime, was extended to larcenies from unknown persons, and to some and possibly all other indictable delinquencies. But the doctrine, at least in later times, has been regarded rather of caution than of absolute law."

Bish. Cr. Proc. § 1056.

Judge Samuel Nelson, then chief justice of the supreme court of judicature of New York, in delivering the opinion of the court in the case of People v. Badgley (October term, 1836), announced the doctrine on this subject to be "that full proof of the body of the crime,—the corpus delicti,—independently of the confession, is not required by any of the cases, and in many of them slight corroborating facts were held sufficient." The offense involved in that case was that of forgery. 16 Wend. 53. More than 20 years later this doctrine was largely discussed by Mr. Justice Clifford in U. S. v. Williams, in which the defendants were charged by indictment with murder on the high seas, and the conclusion reached that "all that can be required is that there should be corroborative evidence tending to prove the facts embraced in the confession; and where such evidence is introduced it belongs to the jury, under the instructions of the court, to determine upon its sufficiency." 1 Cliff. pp. 5–28, Fed. Cas. No. 16,707.

It is insisted by the counsel for the plaintiff in error that these decisions have been qualified by the language of Mr. Justice Brown in the opinion in the case of Isaacs v. U. S., 159 U. S. 487, 16 Sup. Ct. 51, 40 L. Ed. 229; but a careful examination of that case does not sustain this contention of the counsel.

After a pretty thorough, but by no means exhaustive, examination of the reported cases on this subject, we are satisfied that the rule in this country is correctly stated in 6 Am. & Eng. Enc. Law (2d Ed.) p. 582, namely:

"A conviction cannot be had on the extrajudicial confession of the defendant, unless corroborated by proof aliunde of the corpus delicti. Full, direct, and positive evidence, however, of the corpus delicti, is not indispensable. A confession will be sufficient if there be such extrinsic corroborative circumstances as will, when taken in connection with the confession, establish the prisoner's guilt in the minds of the jury beyond a reasonable doubt."

In this case the defendant offered no proof except as to his character, which is fully shown to have been all that it should have

been up to the time when he was sifted by this temptation. The offense is pronounced by the statute to be a misdemeanor, for which the convicted offender shall be imprisoned not less than five nor more than ten years. The trial judge imposed the lowest penalty permitted by the statute. We discover in the proceedings no error of which the plaintiff in error can rightfully complain. He has been most ably represented by counsel, and cautiously guarded as to all his rights by the enlightened and humane magistrate who presided at his trial.

The judgment of the lower court is affirmed.