PEOPLE v. BURLINGAME.

1. CRIMINAL LAW—ARSON—WHETHER EXTRAJUDICIAL CONFESSION VOLUNTARY QUESTION FOR JURY.
   In prosecution for arson, whether defendant's extrajudicial confession was voluntary and not secured by fraud or coercion, held, question for jury, on record.

2. ARSON—CORPUS DELICTI—EXTRAJUDICIAL CONFESSIONS—ADMISSIBILITY.
   In prosecution for arson, evidence of corpus delicti, held, sufficient to render admissible defendant's extrajudicial confession.

3. CRIMINAL LAW—CORPUS DELICTI—CONFESSIONS.
   Introduction of extrajudicial confession without showing corpus delicti aliunde, would have been improper.

4. SAME—INFERENCES FROM FACTS MAY RENDER CONFESSION ADMISSIBLE.
   Where probabilities from facts shown and inferences therefrom indicate corpus delicti, voluntary confession may be introduced, although there may be some testimony to contrary; however, testimony must be very strong to show corpus delicti.

5. SAME—ARSON—INSTRUCTION—ADMISSIONS.
   Where there was some testimony to contrary, it was error for court to state that burning of building was admitted.

6. SAME—TRIAL—COMMENTS OF JUDGE ON EVIDENCE.
   While judge may freely comment on evidence in case and give his own views, he may not state that fact is admitted when there is any testimony whatsoever that raises question of fact.

7. SAME—ARSON—INSTRUCTION AS TO ADMISSION—CURING ERROR.
   In prosecution for arson, error in instructing jury that burning of building was admitted was not reversible, when read in connection with further instruction stating in no uncertain language that jury must first determine beyond reasonable doubt that burning was malicious, that fire was set by defendant, that confession was voluntary, and that, if there was reasonable doubt as to whether alleged confession was voluntarily made, jury should wholly disregard it.

As to proof of corpus delicti in connection with confession, see annotation in 68 L. R. A. 50; 28 L. R. A. (N. S.) 536.

Appeal from Calhoun; Hatch (Blaine W.), J. Submitted January 15, 1932. (Docket No. 197, Calendar No. 35,850.)   Decided March 2, 1932.

R. N. Burlingame was convicted of arson.   Affirmed.

*Joe C. Foster* (*Cummins & Cummins*, of counsel), for appellant.

*Paul W. Voorhies*, Attorney General, *William J. Kearney*, Prosecuting Attorney, and *Horace M. Mechem*, Assistant Prosecuting Attorney, for the people.

BUTZEL, J.  R. N. Burlingame, respondent, was convicted of arson.  He owned and conducted a drug store on the ground floor of a two-story building in Albion, Michigan.  The suite of rooms over the store had been continuously vacant for a long period previous to April 22, 1931.  On the evening of that day a fire broke out in one of the rooms.  A fire had visited respondent's store in 1928 and again in 1930. The first originated in either an adjoining building or the wall partitioning off another store theretofore occupied by him in the same block; the other occurred in the present store.  Both times there were substantial losses, and respondent recovered insurance and subsequently ran fire sales.

The entrance to the stairway leading to the rooms above the store is from the street.  A few steps from the entrance is a landing with a doorway leading into the adjoining store.  Further up, another doorway leads into an apartment occupied by a Mrs. French.  At the top of the stairway there was a steel door, securely locked, which it was necessary to pass through in order to enter the rooms above respond-

ent's store. It was necessary to pass through two other doors locked with padlocks in order to reach the room in which the fire occurred. This particular room had no windows but a skylight, and the entrance was through one of the padlocked doors. The room had been damaged by the 1930 fire, and after the repairs were made, it was carefully cleaned. There was no stove, or other heating apparatus or any rubbish or movable objects of any kind or nature in the room. Some wires previously ran through the area covered by the 1930 fire, but they were dead and useless, as their connections with all live wires had been cut off. They could not have caused the 1931 fire. The charged wires were encased in a metal conduit under the floor. Respondent at one time had the keys to the padlocks on the two inner doors of the suite, but had returned them to the owner of the building.

Respondent was seen on the stairway previous to the date of the fire in the instant case. He explained this fact by stating that he occasionally delivered telephonic messages to Mrs. French and her daughter. Respondent's financial condition was not bad. He owned considerable property, and, although pressed for money, he was better off than the average business man. He carried insurance on his stock and fixtures, but there is no claim that he was overinsured.

The claims of error depend so largely on the facts that a more detailed examination of them is necessary. The prosecution showed as follows: On or about 2 p. m. on the afternoon of April 22, 1931, respondent was seen entering the stairway from its outside entrance. He was wearing a druggist's coat and appeared to be clutching with both hands some bulky object hidden under his coat. The early part

of the evening he left the store in charge of a clerk. On or about 8 p. m. a customer called the clerk's attention to the fact that there was a noise above the store. The clerk ascribed the noise to rats running on the tin ceiling over the store. A few moments later respondent returned, and his attention was also called to the noise. He also stated that it was caused by rats. Very soon thereafter, the ceiling began to flake and became red-hot, and it was discovered that the building was on fire. The fire department, just around the corner, was called and responded immediately.

The firemen found the steel door at the head of the stairway unlocked, but broke through the other doors locked with padlocks. They extinguished the fire very quickly with chemicals and a small amount of water. They chopped open the floor in the fire area which was confined to a small space. Thereupon, one of the firemen, who had been a carpenter, noticed a strong odor in the room. He testified positively that it was that of turpentine, and called it to the attention of one of the other firemen. The latter stated that he thought that the odor was that of turpentine but that it might have been that of pine boards. A fireman whose injured finger had been treated with turpentine by respondent passed through the room for a moment, but after the fire had been extinguished. The fire seemed to have traveled on the top of the joists and burned downwards. It followed the cracks between two boards of the floor. The steel door showed signs of having been forced open by an instrument. All these facts aroused the suspicion of the chief of the fire department, who communicated with the State fire marshal's office in Lansing, and deputies Wall and Allen were directed to make an investigation.

On the evening of May 4th, Allen served a subpœna on respondent, and drove with him to the sheriff's office in the jail at Marshall, Michigan. They, together with Wall, went into a small room adjoining the office, and respondent was interrogated for over three hours. He was questioned in detail as to his previous fires, financial condition, and all other facts that might even remotely bear upon the origin of the fire. After midnight Allen ordered the sheriff to lock up respondent, who was conducted to a cell. He was fingerprinted and claims also to have received unpalatable food for breakfast the following morning. The investigation was again resumed at 8 a. m. Shortly thereafter, Allen claims respondent said: "I might as well tell you I set it," and told the whole story as appears in a confession; that before typing it, Allen informed him of his constitutional rights; that the confession, consisting of two sheets as typewritten by Allen, was handed to respondent, who read it and suggested several corrections, which were made by Allen with pen and ink before it was signed. Although respondent was asked to raise his right hand, there was no jurat to the confession. Respondent's signature is witnessed by Wall, Allen, and the deputy sheriff, who was called in for that purpose. Respondent claims that it was represented to him and that he believed he was signing a financial statement to satisfy the insurance companies; that he did not read the document which covered two pages. He states that Allen, while writing out the statement on the typewriter, asked frequent questions, all relating to plaintiff's financial condition. The confession states that respondent was first advised of his constitutional rights; that he was not obliged to answer any questions, and that such answers might be used against

him; that there were no debts pressing very hard; that he wanted to relieve them as soon as possible, and that after the other fires he had held successful sales, and that he did want to sell his store. He then proceeded to tell how he first took an oblong tin quart can and filled it with turpentine from a large bottle; that then he removed some excelsior from a packing box, put it in a paper sack and secreted it under his coat, and with these articles went up the stairway the afternoon in question; that he found the steel door as well as the others unlocked; that after going to the inner rooms he placed the excelsior on the floor, poured turpentine on it, fastened a lighted candle to the floor with its drippings, locked the padlocks on both doors, and closed the steel door. After making the confession, he was taken back to Albion by Allen. The latter claims that respondent, when taken to the store, showed him the gallon bottle of turpentine from which the tin can had been filled, and also pointed out to him the drawer containing a box of candles, from which he stated he had taken one.

Respondent claims that he was not permitted to use the telephone while in the Marshall jail; that he signed the document upon the representation that it was only a financial statement to be used to satisfy the insurance companies; that he was threatened with the breaking up of his family if he did not sign it; that the document was not read to or by him; that he was told that if he signed the document he would be released; that his treatment in general amounted to coercion, fraud, and the holding out of false promises, and, therefore, the confession should have been excluded by the trial judge. On the other hand, the testimony of the prosecution completely refutes respondent's claims. Respondent also tes-

tified that when he signed the confession, believing it to be a financial statement, he said: "I might as well sign this; you will prosecute me anyway;" that while Allen was preparing the confession, he accused respondent of setting the place on fire, as he had done a "hundred" times during the examination. He further testified as follows:

"*Q.* Do you remember Mr. Allen saying to you in the presence of R. F. Wall and Chief Stoddard at the Albion police station, 'Why, we have treated you fair and square, haven't we?'

"*A.* Yes.

"*Q.* Remember what your answer was?

"*A.* Yes.

"*Q.* What was your answer?

"*A.* As to what?

"*Q.* That was after you had signed this Exhibit 6, wasn't it the purported confession?

"*A.* Yes.

"*Q.* That is right, isn't it?

"*A.* Yes."

He further admitted that he raised his right hand before attaching his signature to the document. Upon taking all these facts into consideration and the testimony of the prosecution, we believe that the question of whether the confession was a voluntary one and not secured by fraud or coercion was for the jury to determine. The trial judge refused to admit the confession until the jury had heard all of the testimony for the prosecution and almost all of that for the defense. There was no error in admitting it under the circumstances, and leaving the question of whether it was a voluntary one or not to the jury.

Another question raised is whether the *corpus delicti* was sufficiently proven so as to permit the admission of the confession, and whether the court erred in his statement in the presence of the jury,

that he thought there was ample proof of the *corpus delicti* and that he really thought that it had been established. An examination of the record leads us to the conclusion that the *corpus delicti* was sufficiently proven so as to admit the confession. It was shown that the steel door at the head of the stairs had been forced open by means of some instrument that left its marks. The room had been empty and bare of all inflammable materials of every kind. One witness testified that the fire started at the top of the joists and burned downwards; two others that the fire traveled on top of the joists, and respondent's witness testified that the joists were not as badly charred near the conduit as further away. Respondent claims that the joists were burned from the bottom up and a witness corroborated his testimony by stating that on looking up from the store, some appeared to be burned down towards the ceiling more than they were up towards the floor above. It is respondent's claim that the fire originated from defective wiring. Any question in regard to the wires not contained in the metal conduit which passed through the area that was burned may be dismissed, inasmuch as there was no denial of the claim that the other wires were dead and disconnected. Respondent offered testimony to show that the light occasionally flickered. A number of weeks after the fire the conduit, through which the wires ran, was taken down and the wires therein were pulled out with some difficulty and the insulation was found burned. The lineman of the Consumers Power Company, who arrived shortly after the fire for the purpose of shutting off the electricity, found that the lights were still going in the store, notwithstanding the fire. He also found that the dead wires were disconnected and not charged. He further swore positively that the fire could not have been caused

by defective wiring. There was testimony to the effect that there was a large fuse which would have blown had the wires become grounded. The ceiling was also tested and found not to be charged with electricity. One witness for respondent stated that there might have been a spark in the conduit and the conditions therein might have caused the fire. While testimony for respondent might indicate a possibility that the fire was caused by defective wiring, the testimony of the prosecution that it could not have been caused in this manner is very persuasive. It was shown by testimony that the fire was not caused by defective wiring. It would have been improper to introduce an extrajudicial confession without showing the *corpus delicti aliunde*. The circumstances in the case, without the confession, like those in *Peterson* v. *Oceana Circuit Judge,* 243 Mich. 215, raise a probability that the fire was caused by human intervention and warranted the submission of the confession to the jury. Where the probabilities from the facts shown and the inferences therefrom indicate the *corpus delicti,* a voluntary confession may be introduced, although there may be some testimony to the contrary. The testimony, however, must be very strong to show the *corpus delicti.* It was so in the present case. See *Peterson* v. *Oceana Circuit Judge, supra; People* v. *Dowd,* 252 Mich. 404; *People* v. *Trine,* 164 Mich. 1; *People* v. *Mindeman,* 157 Mich. 120, 124; *Flower* v. *U. S.,* 53 C. C. A. 271 (116 Fed. 241); *Griffiths* v. *State,* 163 Ind. 555 (72 N. E. 563); *State* v. *Knowles,* 185 Mo. 141 (83 S. W. 1083); *Sullivan* v. *State,* 58 Neb. 796 (79 N. W. 721); *State* v. *Brinkley,* 55 Ore. 134 (104 Pac. 893, 105 Pac. 708).

The judge in his charge, after giving the respective claims of the prosecution and the respondent, and the definition of "arson," stated that it was in-

cumbent upon the prosecution to establish (1) that the building was burned, and (2) that it was by the wilful and malicious act of the respondent, and not as the result of natural or accidental causes. He then defined the meaning of the word "burned" under the statute, and charged the jury as follows:

"I charge you that when the first element is established that the building had been burned, which is admitted in this case, the foundation is laid for the people to then present evidence that the crime was committed by the defendant with criminal intent."

It was error for the court to state that the burning of the building was admitted in the case. A judge may freely comment upon the evidence in a case and give his own views. He may not state that a fact is admitted, when there is any testimony whatsoever that raises a question of fact. We do not believe, however, that it is reversible error in the present case, because when this excerpt of the charge is read in connection with the further remarks of the judge, it is noted that he stated in no uncertain language that the jury must first determine beyond a reasonable doubt that the burning was malicious, that the fire was set by defendant, and that the confession was voluntary; that if there was a reasonable doubt as to whether such alleged confession was freely and voluntarily made, the jury should wholly disregard it.

There are other claims of error. We need not discuss them, as in the main they relate to the questions discussed, and even if there were any merit to the others, they would not constitute reversible error. The judgment of conviction is affirmed.

CLARK, C. J., and McDONALD, POTTER, SHARPE, NORTH, FEAD, and WIEST, JJ., concurred.