PEOPLE *v.* PRESTON.

1. CRIMINAL LAW—MALICIOUS MISCHIEF—CORPUS DELICTI—EVIDENCE ALIUNDE CONFESSION.

In prosecution for malicious poisoning of cattle, testimony and circumstances *aliunde* defendant's alleged confession *held,* to show that the cattle were destroyed by poison given in mixed feed with which the owner was feeding them, that the poison could only reach the bin by human effort, and that placing it there was malicious and not accidental (Act No. 328, § 377, Pub. Acts 1931).

2. ANIMALS—MALICIOUS MISCHIEF—CORPUS DELICTI.

In prosecution for malicious poisoning of cattle, the *corpus delicti* includes not merely the poisoning of the cattle but that it must have been the wilful and malicious act of some person criminally responsible for his acts and not by natural or accidental causes.

3. CRIMINAL LAW—INFERENCES—CONFESSIONS—CORPUS DELICTI.

Where probabilities from facts shown and inferences therefrom indicate *corpus delicti,* voluntary confession may be introduced, although there may be some testimony to contrary; however, testimony must be very strong to show *corpus delicti.*

4. SAME—MALICIOUS MISCHIEF—VOLUNTARY NATURE OF CONFESSION —ALIBI—QUESTIONS FOR JURY.

In prosecution for malicious mischief, whether defendant's alleged confession was voluntary or not, weight to be given defendant's alibi and whether death of the cattle resulted from the criminal acts of defendant as alleged in information *held,* questions for jury that were submitted under proper and fair instructions (Act No. 328, § 377, Pub. Acts 1931).

Appeal from Cass; Warner (Glenn E.), J. Submitted October 16, 1941. (Docket No. 89, Calendar No. 41,686.) Decided December 2, 1941. Rehearing denied February 11, 1942.

Frank Preston was convicted of malicious poisoning of cattle. Affirmed.

*Carl D. Mosier,* for appellant.

*Herbert J. Rushton,* Attorney General, and *Asa K. Hayden,* Prosecuting Attorney, for the people.

Chandler, J. The respondent is charged with wilfully and maliciously killing three cows, property of Mr. Victor Waltz, on or about March 9, 1940, at the township of Porter, Cass county, in violation of Act No. 328, § 377, Pub. Acts 1931 (Comp. Laws Supp. 1940, § 17115–377, Stat. Ann. § 28.609), and upon a trial in the circuit court of that county by a jury was found guilty of the offense, and sentenced by the trial judge to the State penitentiary for a period of not less than two nor more than four years.

It is from this conviction and sentence that respondent appeals.

After a careful review of the record and briefs filed herein, we find that there is but one question presented for our consideration, namely: Are the circumstances and testimony here, *aliunde* the confession of the respondent, sufficient to create such a probability that the death of the cattle in question was intentionally caused by human intervention and to justify the admission in evidence of the alleged confession of the respondent?

Upon the trial of the case the following undisputed facts were developed: the respondent and Mr. Waltz live on adjoining farms in Porter township and have for a period of at least 20 years. Their buildings are about 40 or 50 rods apart. In 1921 Mr. Waltz and respondent had some trouble over some hogs that respondent had sold to Mr. Waltz, which engendered considerable ill feeling, and this ill feeling appears to have continued from that time until the acts complained of against respondent. While during a portion of this time Mr. Waltz and Mr. Preston exchanged work, the

families never called upon each other, and there were periods when they were not on speaking terms. In 1938 these gentlemen had some trouble over a neighborhood threshing outfit, and while it is apparent that these difficulties between these two men were trivial and inconsequential, the feeling between them was such as to justify the conclusion that they had not been on neighborly or friendly terms during a period of nearly 20 years.

On March 6, 1940, Mr. and Mrs. Waltz left their home at about 12:30 to attend the funeral of Mr. Waltz' mother at Three Rivers and returned about 4:30 or 5 o'clock in the afternoon. No one other than Mr. and Mrs. Waltz lived on the farm and Mr. Waltz did his own chores. On the morning of March 7th when Mr. Waltz went to his barn, he found that one of his cows was ailing. On March 8th, five of them were ill, and he sent for Dr. Reed, a veterinarian, of Constantine, who treated them. Dr. Reed was suspicious that these cows in some way had partaken of arsenate of lead and he made an examination of the building and enclosure in which the cows were kept to ascertain if there was any paint that the cattle might have partaken of in any way, but finding nothing to account for their illness he gave them a treatment, a remedy used quite extensively upon cattle which had symptoms of scours, and left some medicine to be administered by Mr. Waltz. On March 9th one of the cows was down and the rest of Mr. Waltz' cattle were ill. He then sent for another veterinarian, Dr. Bergman, of Cassopolis, who administered to the cattle some serum. Dr. Bergman also made an examination to discover the possibility of any particular poison, any metallic poison around the barn and the barnyard, but was unable to discover anything there that would cause

this illness. The veterinarian left with Mr. Waltz medicine with instructions for its administration, and returned the following day. He at that time was suspicious of poisoning by lead and arsenic, or lead or arsenic. He called again the following morning and found that one of the cows had died. He then performed a post mortem and took some of the internal organs, that is, parts of the alimentary canal and a section of the liver and kidney, to the pathological department of the Michigan State College and delivered the same to Dr. Roland of that department. He also took with him for examination a sample of the feed that Mr. Waltz had been feeding his cattle. The treatment of the animals was continued by Dr. Bergman, all of them showing symptoms of sickness, and later another one of the cows and a heifer died. The contents of the liver from these two animals were also taken to the laboratory by Dr. Bergman. An analysis of the organs of the animals and of the feed was made by a Mr. Van Loo, a chemist in the State department of agriculture, and his examination disclosed, both in the organs of the cattle and in the feed, the presence of lead, as well as of arsenic. His opinion, from his analysis, was that there was enough poison in the feed to cause the death of these cattle. Dr. Bergman gave as his opinion that poisoning caused the death of these three cattle.

Mr. Waltz testified that the feed given these cattle on the evening of March 6th and the morning of March 7th was from a bin of mixed feed, which was mixed by himself and from which he had been feeding these cattle for several months, and that no other feed was given the cattle except corn fodder; also, that no one other than himself, so far as he knew, participated in the feeding of his cattle, or took any part in the mixing of the feed. Mr.

Waltz further testified that he had no means of knowing how the poison got mixed with the feed given his cattle.

On July 6, 1940, respondent was arrested by State Troopers Phil E. Paulsen and James Weiers at about 3 or 4 o'clock in the afternoon, and was taken to the State police headquarters at White Pigeon. For several hours after his arrest he was questioned at the police post by the officers about the poisoning of Waltz' cattle, during which talk respondent denied having any connection with it. In the evening Franklin P. Bush, justice of the peace of Constantine, St. Joseph county, was called, and soon after his arrival respondent, in answer to questions by the justice of the peace, made a confession which was typed by Mr. Bush and signed by respondent. At the examination and upon the trial the alleged confession was admitted in evidence after the testimony of Mr. Waltz, Dr. Bergman, chemist Abram Van Loo, and Trooper James Weiers was given. The confession, which was admitted in evidence over objection of respondent's counsel, was to the effect that he and Mr. Waltz had not been on good terms for practically 20 years, that he did not like Mr. Waltz, that he felt he had been wronged by him, that he had it in for Mr. Waltz because of their various difficulties. A portion of his confession we quote:

"*Q.* You then decided it would be a good idea to get even with Waltz for all this trouble he caused you?

"*A.* Yes, I thought it was pretty near time.

"*Q.* What did you decide to do to get even?

"*A.* I suppose to give that poison to them cattle.

"*Q.* What kind of poison did you decide to give them?

"*A.* Arsenate of lead.

"*Q.* When and were did you purchase this poison?

"*A.* It was two or three years ago. I have had it on hand to spray potatoes with, for bugs."

Respondent knew of the death of Mr. Waltz' mother according to the alleged confession and knew that Mr. and Mrs. Waltz were attending the funeral on the afternoon of March 6th. The alleged confession further disclosed that when he went to the Waltz barn he took with him three tablespoonfuls of this poison and put it in the feed bin from which Mr. Waltz fed his cows. He was asked:

"*Q.* You knew that that was enough poison to kill his cattle?

"*A.* Yes, it was enough, I guess.

"*Q.* That was what you intended to do?

"*A.* Yes.

"*Q.* You put all the poison in the bin?

"*A.* Yes. All in the bin. It was ground feed."

The testimony of Mr. Bush, the justice of the peace, and Trooper Weiers was to the effect, and this was admitted by the respondent, that he was informed of his constitutional rights and was warned that anything that he might say could be used against him. The testimony of Weiers and Bush was to the effect that no promises or threats of any kind were made against respondent and that the confession signed by him was made freely. Counsel for respondent at the close of the examination moved the justice for the dismissal of respondent, which motion was denied, and respondent was held for trial before the circuit court. A motion was made by respondent in the circuit court for respondent's dismissal, before the taking of testimony, for the reason that no offense had been proved to have been committed outside of the alleged confession of respondent upon his examina-

tion. This motion was also denied. At the close of the people's proof a similar motion was made for the discharge of respondent, which was also denied. The motion was renewed at the close of all of the testimony with a similar result.

The respondent was a witness in his own behalf upon the trial, and admitted the signing of the alleged confession, but claimed that he had done so because of threats made by Troopers Paulsen and Weiers that if he didn't confess they were going to take him to Lansing and weren't going to let him come back for trial. Respondent testified:

"I confessed to taking the poison over there because they claimed they was going to take me up there and wasn't going to fetch me back here. They said they were going to take me up there right away—going to take me that night, and Paulsen said that they would not let me come back here to Cass county. After they had said that to me, well, I thought about it—studied over it quite awhile before I confessed it, and after I had told them that I did this they were going to get Bush out and take a statement. No, he did not come out and talk with me. He wasn't in and talked with me until—well, it must have been 9–10 o'clock. And then when he came, he sat down at the typewriter and wrote out those questions. I guess that those questions and answers that appear in this statement or confession are about the same questions that the troopers asked of me before. Before I agreed to confess to this thing, I had been talking with them—it was around 9 or half past or 10 o'clock—somewheres in there; and previous to that I had denied my guilt in connection with this.

"After I signed this paper, Mr. Bush left and they fetched me over to Cass. It was about 2 o'clock when I got to Cass. I looked at the clock myself. The next day I was brought before a jus-

tice of the peace and gave a bond and I have been released. on bail since that time.

"Well, I knew when the funeral was and I supposed the Waltz' would go.

"That was a false report where the paper says that on the 6th of March I went over to the Waltz place to locate a pig. I did not go over to the Waltz place on March 6th to locate a pig. I had not lost any pig that day.

"I did not go over to Waltz' home that day. I did not put any poison in any of the feed in the barn of Mr. Waltz that day or any other day. That report, then, about the pig was false.

"I said that I knew when the Waltz funeral was to be held. I knew that Mr. Waltz' mother had died and I come to tell the State Police that I put this poison there the day of the funeral because I had men there buying clover seed of me. There was men there buying clover seed that day to prove that I was to home. My reason for that, then, was that I knew that on that day that I was home and that there were people there that day knew I was at home. Now, on the day that this funeral took place, March 6th, I was home that day. Mrs. Preston was not home that day. She was away helping quilt some place to her sister-in-law's or her brother's."

Respondent's brother, Onie Preston, testified that he was with respondent at his, respondent's, home during the whole of the afternoon on March 6th and that his brother did not leave his home that afternoon. Another witness for respondent, Roy Milhiser, testified that he was at respondent's home that afternoon to purchase clover seed and that he was with respondent from 12:30 or thereabouts for an hour or an hour and a half.

The testimony of respondent as to the threats made by the State troopers was denied by Trooper

Weiers, Trooper Paulsen not being called as a witness because of his confinement in a hospital. The testimony of witness Bush was to the effect that no threats or promises were made, that the alleged confession was taken by questions and answers in exactly the same words as appeared in the alleged confession.

Timely objections were made by counsel for respondent to the admission of the alleged confession in evidence which were overruled by the trial judge.

Counsel for respondent vigorously argues that there was no evidence of the *corpus delicti aliunde* the respondent's so-called confession, and that the court was in error in admitting said confession in evidence and in denying the various motions of counsel for the discharge of respondent.

A review of the record indicates to us that there is no merit to respondent's contention that the people had failed to prove the commission of a crime without respondent's confession. It seems to us that the testimony and the circumstances *aliunde* the confession are most convincing that the three head of cattle, the property of Mr. Waltz, were destroyed by reason of poison given to them in the mixed feed with which the owner was feeding his cattle; that the poison could only reach the bin from which the feed was taken by some human agency; and it unquestionably follows that the placing of the poison in the feed was malicious and wilful, and placed there with the intent to poison these cattle. The testimony is also conclusive that the poison found in the organs of the dead animals was of the same kind as was disclosed to be in the mixed feed taken from the bin from which the owner fed these cattle.

We appreciate that the *corpus delicti* in this case is not merely the poisoning of these cattle, but that it must have been the wilful and malicious act of

some person criminally responsible for his acts and not by natural and/or accidental causes. The testimony in the instant case, apart from the confession or admission of respondent, raises not only a strong probability, but, to our mind, conclusively establishes that poison administered by some one caused the death of these cattle; that their death was not a natural one, and that the administration of the poison was not accidental.

We can well conclude this opinion by quoting verbatim from *People* v. *Burlingame,* 257 Mich. 252, 260:

"Where the probabilities from the facts shown and the inferences therefrom indicate the *corpus delicti,* a voluntary confession may be introduced, although there may be some testimony to the contrary. The testimony, however, must be very strong to show the *corpus delicti.* It was so in the present case. See *Peterson* v. *Oceana Circuit Judge,* 243 Mich. 215; *People* v. *Dowd,* 252 Mich. 404; *People* v. *Trine,* 164 Mich. 1; *People* v. *Mindeman,* 157 Mich. 120, 124; *Flower* v. *United States,* 53 C. C. A. 271 (116 Fed. 241); *Griffiths* v. *State,* 163 Ind. 555 (72 N. E. 563); *State* v. *Knowles,* 185 Mo. 141 (83 S. W. 1083); *Sullivan* v. *State,* 58 Neb. 796 (79 N. W. 721); *State* v. *Brinkley,* 55 Ore. 134 (104 Pac. 893, 105 Pac. 708)."

We have carefully reviewed the numerous cases cited and quoted from by respondent in his brief, and find that none of them support his contention that the *corpus delicti* was not established in the instant case before the admission in evidence of his alleged confession.

The questions as to whether the alleged confession was voluntary or not and as to the credit that should be accorded respondent's alibi, as well as the question as to whether the death of the cattle resulted

from the criminal acts of respondent as alleged in the information, were for the consideration of the jury, and were submitted to it under proper and fair instructions by the trial court.

We find no error in the proceedings herein.

The conviction and sentence are affirmed.

SHARPE, C. J., and BUSHNELL, BOYLES, NORTH, STARR, WIEST, and BUTZEL, JJ., concurred.