PEOPLE v MODELSKI

Docket No. 82600. Submitted January 8, 1987, at Lansing. Decided November 3, 1987.

Adam J. Modelski was convicted of manslaughter following a jury trial in Kalamazoo Circuit Court, Richard R. Lamb, J., and was sentenced to ten to fifteen years' imprisonment. Defendant appealed, claiming error by the trial court in ruling that the prosecutor had sufficiently established the corpus delicti of the homicide involving defendant's wife to allow for the admission of evidence of several confessions defendant had made to the police and other individuals. Defendant also claimed that the prosecutor's remarks at closing argument were so prejudicial that they denied him a fair trial.

The Court of Appeals *held:*

1. The corpus delicti of homicide is established when the prosecutor establishes by a preponderance of direct or circumstantial evidence that the victim is dead and that death was the result of some criminal agency. In this case, the prosecutor established the corpus delicti by showing that the victim could not be located and has not been heard from since her sudden disappearance, defendant had a motive to kill her, and defendant's actions suggested that he had murdered the victim.

2. By failing to object at trial or request curative instructions to the jury, defendant has waived appellate review of his claim that the prosecutor improperly appealed to the jury to sympa-

REFERENCES

Am Jur 2d, Homicide §§ 431-433, 463, 559, 561, 562.

Am Jur 2d, Trial §§ 280 *et seq.;* 682 *et seq.;* 906 *et seq.*

Failure to object to improper questions or comments as to defendant's pretrial silence or failure to testify as constituting waiver of right to complain of error—modern cases. 32 ALR4th 774.

Propriety and prejudicial effect of prosecutor's argument to jury indicating his belief or knowledge as to guilt of accused—modern state cases. 88 ALR3d 449.

Propriety and prejudicial effect of prosecuting attorney's arguing new matter or points in his closing summation in criminal case. 26 ALR3d 1409.

See also the annotations in the Index to Annotations under Arguments of Counsel.

thize with the victim. Moreover, the prosecutor's argument was in response to defendant's defense strategy of claiming that defendant had killed the victim in a fit of rage because of her infidelity.

Affirmed.

1. HOMICIDE — CORPUS DELICTI.

The corpus delicti of homicide is established when the prosecutor establishes by a preponderance of direct or circumstantial evidence that the victim is dead and that death was the result of some criminal agency.

2. CRIMINAL LAW — ARGUMENT OF COUNSEL — EVIDENCE.

A prosecutor may not appeal to the jury to sympathize with the victim nor may he argue facts not in evidence; however, the prosecutor is free to comment on the evidence and all the reasonable inferences that can be drawn from the evidence as well as to respond to issues raised by defense counsel.

3. CRIMINAL LAW — ARGUMENT OF COUNSEL — PRESERVING QUESTION.

Appellate review of a prosecutor's closing argument is precluded in the absence of objection unless failure to consider the issue would result in a miscarriage of justice.

4. CRIMINAL LAW — ARGUMENT OF COUNSEL — CURATIVE INSTRUCTIONS.

Error requiring reversal does not result from failure to give cautionary instructions to the jury in response to a prosecutor's closing argument where appropriate instructions would have cured any prejudice and instructions were not requested.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *James J. Gregart,* Prosecuting Attorney, and *Christopher K. Cooke,* Assistant Prosecuting Attorney, for the people.

*Milton J. Marovich, P.C.* (by *Milton J. Marovich*), for defendant.

Before: HOOD, P.J., and BEASLEY and L. TOWNSEND,* JJ.

* Recorder's Court judge, sitting on the Court of Appeals by assignment.

Per Curiam. Defendant was charged with the first-degree murder of his wife, Jeanne Modelski. Following a lengthy jury trial, defendant was convicted of manslaughter, MCL 750.321; MSA 28.553, and was sentenced to ten to fifteen years' imprisonment. He now appeals as of right, raising two issues: (1) that in admitting defendant's confession the trial judge erred in ruling that the prosecutor had established the corpus delicti of homicide; and (2) that the prosecutor's closing argument was so prejudicial as to deny defendant a fair trial. Finding no merit to either argument, we affirm defendant's conviction.

Jeanne Modelski and defendant began cohabitating in October, 1977, and were married in December, 1979. By all accounts, the relationship was a stormy one. There were frequent and loud arguments, instances of violence and allegations by defendant of Jeanne's infidelity. The couple was living together in an apartment in Kalamazoo when Jeanne disappeared suddenly in late April, 1980. She has not been heard from since and a body has never been found.

Following Jeanne's disappearance, defendant telephoned her friends and relatives, asking whether they had seen her or heard from her. However, in the two years following Jeanne's disappearance, defendant confessed to friends, a paramour and to police that he killed Jeanne in a fit of rage following an argument with her.

In April, 1980, on the day after he killed Jeanne, defendant told a co-worker and a friend, Maurice Morrison, that he had shot his wife and disposed of her body in Indiana. In February, 1981, he told a paramour, Laurie Verdille, that he had killed his wife. She testified that defendant told her of the killing after she and he had seen a movie depicting a husband killing his wife. Defen-

dant told her that he and Jeanne had been fighting, that both were drunk, and that he had removed his handgun from the closet and shot Jeanne once through the head while she was in the bathroom of their apartment. He could not recall where he had dumped the body. In May, 1982, while defendant was in the Army, stationed in Germany, he confessed that he killed his wife to his Army supervisor, David Meeks. Defendant and Meeks were drinking in a German discotheque and defendant was drunk when he told Meeks that he had shot his wife in the head with a revolver and then had driven across the state line and dumped her body in a wooded area.

Finally, when defendant was arrested on October 11, 1983, he made a full confession to police. He stated that he had shot Jeanne once through the head as she sat on the toilet. He caught her as she fell forward and laid her in the bathtub. Eventually, he removed the tarpaulin from his motorcycle, wrapped Jeanne's body and placed it in the back of his truck, drove to a wetland, wooded area in Indiana, and dumped it. Defendant initially accompanied police to Indiana to attempt to locate the body. However, the body was not found and on the advice of his brother, an attorney, defendant refused further cooperation with police.

At trial, the judge overruled each of defendant's objections that his confessions were inadmissible because the corpus delicti of homicide had not been established.

I

First, defendant claims that the trial judge erred in refusing to suppress his confession because the prosecutor failed to establish the corpus delicti of homicide.

The common law in Michigan, and many other jurisdictions, is that a defendant's confession is inadmissible unless the corpus delicti of the offense is first established. *People v Coapman,* 326 Mich 321; 40 NW2d 167 (1949); *People v Mondich,* 234 Mich 590, 593; 208 NW 675 (1926); *People v Skowronski,* 61 Mich App 71; 232 NW2d 306 (1975). The Latin word "corpus" means body. "Delict" means wrong or injury. Thus, generally speaking, the corpus delicti of an offense is the body of the wrong or injury. *People v Allen,* 390 Mich 383; 212 NW2d 21 (1973). Consequently, the corpus delicti of a homicide is shown and a confession may be admitted when the prosecutor establishes that the victim is dead and that the death was the result of some criminal agency. *People v Williams,* 422 Mich 381; 373 NW2d 567 (1985).

The purpose of the corpus delicti rule is to guard against a conviction for a criminal homicide when none has been committed. Despite some confusion to the contrary, the corpus delicti of a homicide offense can be established without locating the body of the deceased. *Williams, supra.* The corpus delicti may be established by circumstantial evidence and the reasonable inferences drawn therefrom. *People v Neal,* 83 Mich App 102; 268 NW2d 303 (1978); *People v Wise,* 134 Mich App 82, 88; 351 NW2d 255 (1984).

Michigan law is not clear concerning the quantum of proof necessary to establish the corpus delicti of homicide. The prosecutor need not establish the corpus delicti beyond a reasonable doubt. *Wise, supra.* In *Wise,* this Court concluded that "the evidence adduced need only tend to show consistency with unlawfulness in causing the injury in question." 134 Mich App 88. This standard appears to be similar to the standard adopted by the California Court of Appeals in *People v Man-*

*son,* 71 Cal App 3d 1, 41; 139 Cal Rptr 275, 297 (1977), where the court noted:

> The preliminary proof of the corpus delicti need not be beyond a reasonable doubt but only a slight or prima facie showing is necessary.

A three-member dissent in *People v Kirby,* 223 Mich 440, 453-466; 194 NW 142 (1923), concluded that the corpus delicti was established where there was any evidence of the crime. However, cases thereafter have addressed the issue in terms of probabilities:

> Where the probabilities from the facts shown and the inferences therefrom indicate the *corpus delicti,* a voluntary confession may be introduced, although there may be some testimony to the contrary. The testimony, however, must be very strong to show the *corpus delicti.* [*People v Burlingame,* 257 Mich 252, 260; 241 NW 253 (1932)]

See also *People v Preston,* 299 Mich 484, 493; 300 NW 853 (1941); *People v Zwierkowski,* 368 Mich 56, 60; 117 NW2d 179 (1962).

From the above authorities, we conclude that the corpus delicti of homicide is established when the prosecutor establishes by a preponderance of direct or circumstantial evidence that the victim is dead and that death was the result of some criminal agency

In the instant case, the prosecutor established the corpus delicti of a homicide by showing that Jeanne could not be located and has not been heard from since her sudden disappearance and by showing that defendant had a motive to kill her, his deteriorating marriage and his claim of infidelity, and by showing that defendant's actions suggest that he had murdered Jeanne.

The evidence adduced at trial suggested that Jeanne had led a troubled life and was sometimes emotionally unstable and unpredictable. Born in 1959 and adopted by Milo and Edna Henkels at age 2½, Jeanne had a history of running away from the Henkelses. She ran away at age thirteen and apparently never returned, although she maintained regular contact with the Henkelses up until her disappearance. In 1975, she went into the foster home provided by Marcia and Mahlon Kuder. She was pregnant at the time. She gave birth and relinquished custody of the baby. Although Jeanne was physically healthy, on two occasions, most recently in April, 1980, she required hospitalization following an overdose of prescription drugs.

Both defendant's mother and father testified that Jeanne had a history of leaving defendant. However, defendant's mother testified that Jeanne usually returned after one day and that she had never been gone more than three days.

Despite Jeanne's unstable upbringing, she established a close and consistent relationship with a number of people, none of whom have heard from her since April, 1980. The Henkelses testified that they normally heard from or saw Jeanne every two weeks or so. They last spoke with her on April 25 or 26, 1980. Similarly, the Kuders testified that they regularly heard from Jeanne until late April, 1980, when she disappeared suddenly. Patrice Reagan, the Kuders' daughter, enjoyed a sister-like relationship with Jeanne. After Reagan moved to Canada, she and Jeanne kept in touch by telephone and regular correspondence. Shortly before Jeanne's disappearance, they discussed a proposed visit of Jeanne's to Reagan's home. Reagan has not heard from Jeanne since then.

There was also substantial testimony concerning efforts to locate Jeanne. The prosecutor presented

evidence that Jeanne had not filed either federal or state tax returns since 1980. Similarly, according to the social security records, there was no history of earnings since 1980. Nor had a driver's license in the victim's name been issued in any state or the District of Columbia. There was no credit history for the victim after 1979, nor was there a passport applied for or approved in the name of the victim.

In addition to establishing Jeanne's sudden disappearance and the fact that she could not be located, the prosecutor also established that defendant had a motive for killing Jeanne. At the time of Jeanne's disappearance, her marriage with defendant had seriously deteriorated. Jeanne had informed others that she was thinking of leaving defendant. A number of witnesses testified to hearing defendant and Jeanne arguing and fighting. At the time that Jeanne last telephoned the Henkelses on April 25 or 26, 1980, she was upset and crying and the Henkelses could hear yelling from defendant in the background. The Kuders testified that when defendant visited them on April 13, 1980, he complained about Jeanne's lax housekeeping practices. In response, in the latter part of April, 1980, Mrs. Kuder went to help Jeanne with housekeeping in an effort to alleviate the marital difficulties. Upon arriving at the apartment, she sensed that she had interrupted a fight. Defendant and Jeanne suggested that she return at another time.

There was also testimony that defendant believed that Jeanne had been unfaithful to him. He had expressed this thought to co-workers and to Laurie Verdille. Apparently he had contracted venereal disease, for which he blamed Jeanne. Defendant's fears were well-grounded. A co-worker of defendant's testified that he had engaged in

sexual intercourse with Jeanne six months before her marriage to defendant, presumably when she was living with defendant. A second witness testified that he had engaged in sex with Jeanne after meeting her in the course of his door-to-door sales work.

Certain of defendant's actions after Jeanne's sudden disappearance support a finding that she died as a result of some criminal agency perpetrated by defendant. Dennis Weesner, a co-worker of defendant's, testified that shortly after Jeanne disappeared he directed defendant to listen to a song on the radio entitled "Kill My Wife." Defendant became angry and asked Weesner if that was an accusation. In addition, when Weesner purchased defendant's truck in the latter part of 1980, defendant told him:

> What he [defendant] had done was so bad [that] he didn't want to really tell [Weesner], and that his dad knew [about it], and it was so bad he couldn't believe somebody could even write a book about it, that was his dad's opinion of it.

Furthermore, when defendant reported that Jeanne was missing on May 1, 1980, he informed police that Jeanne was upset over losing a babysitting job for Professor Robert Ackerman, a single parent with a young son. However, Ackerman testified that although he was forced to lay off Jeanne in March, 1980, after he broke his leg, he went to great lengths to ensure that Jeanne would not accept other employment and would be available when the witness returned to work. He continued to pay Jeanne one-third to one-half of her salary so that she would not find other employment and he regularly telephoned her every eight to ten days.

Finally, there was evidence that defendant gave away Jeanne's personal effects. Within a week or two after defendant met Laurie Verdille, he gave her all of Jeanne's personal effects, jewelry and clothing, including her purse, which contained her makeup, her social security card and her marriage license. It is unlikely that Jeanne would have left defendant without taking these items.

We conclude that when all the evidence is considered, the prosecutor established by a preponderance of the evidence that Jeanne is dead and that her death was the result of some criminal agency. Accordingly, we conclude that the trial judge correctly ruled that defendant's confessions were admissible.

## II

Defendant also claims that the prosecutor's closing argument was so prejudicial as to deprive defendant of a fair trial. Specifically, defendant claims that the prosecutor obtained defendant's conviction by improperly evoking sympathy for the dead victim. Defendant cites the following portion of the prosecutor's closing argument:

> There is nothing to suggest, nothing, that she deserved to die.
>
> She sought love at one point from her natural parents, and we know that she was adopted, they gave her up for whatever reason, there's nothing in the record for us to know why. She sought love from the Henkels[es], and she was placed in a foster home.
>
> She sought love and understanding from her foster family even to the point of going into a daughter's room and attempting suicide with pills all lined up saying, "I want to be found."
>
> And tragically, we have Mr. Kuder who basi-

cally tells you—you know—"I wasn't that close to her." She loved him, it just didn't seem to be reciprocated.

She went out with men, she was looking for love there, she was looking for sympathy, didn't find any, got—she got married to Adam Modelski; try to find what she had been looking for for her entire life, and didn't find this there, either.

It is an established rule that a prosecutor may not appeal to the jury to sympathize with the victim. *People v Wise, supra; People v Leverette,* 112 Mich App 142; 315 NW2d 876 (1982). Nor may he argue facts not in evidence. *People v Partee,* 410 Mich 871 (1980); *People v Wise, supra.* However, the prosecutor is free to comment on the evidence and all the reasonable inferences that can be drawn from the evidence. *People v Ernest Smith,* 87 Mich App 18; 273 NW2d 573 (1978).

The prosecutor's argument does not require reversal of defendant's conviction. Initially, defendant neither objected to the argument nor requested a curative instruction. The failure to object to a prosecutor's closing argument at trial bars appellate review, unless failure to consider the issue would result in a miscarriage of justice. *People v Duncan,* 402 Mich 1, 15-16; 260 NW2d 58 (1977). Reversal will not be ordered if an alleged prejudicial error could have been corrected by a curative instruction and one was not requested. *People v Hall,* 396 Mich 650, 655; 242 NW2d 377 (1976). Failure to consider the issue would not result in manifest injustice in the instant case because any error could have been cured by a timely objection and an accompanying cautionary instruction.

Moreover, the prosecutor's argument was in response to defendant's defense strategy, evident throughout the trial, of claiming that defendant

had killed Jeanne in a fit of rage because of her infidelity. Thus, for example, in response to the prosecutor's closing argument, defense counsel argued:

> [Jeanne] was searching for love, alright, but it wasn't the kind of love that was healthy or that was normal, and it was certainly the kind of situation that she created to slowly but surely drive a man into rage because he's loved her, he's put up with her, and perhaps at times he became exasperated; perhaps at times there were awful arguments, but that was a two-way street.

A prosecutor may properly respond to issues previously raised by a defense counsel. *People v Jansson,* 116 Mich App 674; 323 NW2d 508 (1982). That is what occurred in the instant case. Thus, defense counsel not only failed to object to the prosecutor's argument, he also used the argument as a springboard for his own closing argument. Accordingly, we conclude there was no error.

Affirmed.