**GOVERNMENT OF the VIRGIN ISLANDS**

*v.*

**Raphello HARRIS, Sr., Appellant.**

**No. 90–3532.**

United States Court of Appeals, Third Circuit.

Argued April 22, 1991.

Decided July 3, 1991.

---

Iver A. Stridiron (argued), Charlotte Amalie, St. Thomas, U.S. Virgin Islands, for appellant.

Azekah E. Jennings (argued), U.S. Atty.'s Office, Charlotte Amalie, St. Thomas, U.S. Virgin Islands, for appellee.

Before BECKER, SCIRICA and ALITO, Circuit Judges.

SCIRICA, Circuit Judge.

Raphello Harris, Sr. was convicted of murder in the first degree and possession of a dangerous weapon during the commission of a crime of violence. On appeal he contends that there was insufficient evidence to establish the corpus delicti for the jury's verdict of murder in the first degree, or to support the jury's verdict of possession of a dangerous weapon. He also maintains that this evidence was inadmissible. In addition, he states that the district court erred in admitting evidence of his past acts of violence toward the victim, his ex-wife. We will affirm.

I.

On August 14, 1989, Judith Harris left St. Kitts, West Indies by airplane and arrived at the Cyril E. King Airport in St. Thomas, Virgin Islands. She has not been seen nor heard from since.

Mrs. Harris often travelled between St. Kitts and the Virgin Islands because her former husband, Raphello Harris, Sr., and her son, Raphello Harris, Jr., age 18, lived in St. Thomas and because occasionally she worked there. Mrs. Harris and the Harris's other three children lived in St. Kitts in a home owned by Mr. Harris. The Harris's marriage ended on March 14, 1989 in an uncontested divorce that had been initiated by Mr. Harris.

Mrs. Harris was scheduled to arrive at St. Thomas on August 15, 1989 and to stay with a family member. Instead, she arrived on August 14, carrying with her a number of packages for several people in St. Thomas from their relatives in St. Kitts. Raphello Harris, Jr. was unaware that his mother was arriving a day earlier than she had told him.

On the morning of August 14, 1989, Mr. Harris, a construction contractor, drove Raphello Harris, Jr., who had recently begun to work with him, to their jobsite in Annas Retreat, St. Thomas. The jobsite was within eyesight and walking distance of an apartment maintained by Mr. Harris on the ground floor of a private home. Mrs. Harris sometimes stayed in this apartment when she visited St. Thomas.

According to Raphello Harris, Jr., Mr. Harris soon left the jobsite with the stated purpose of buying building materials. While driving, Mr. Harris happened to see a friend and offered him a ride to the airport, where the friend worked. The

friend testified that Mr. Harris's stated trip into town was to purchase building materials. Mr. Harris drove his friend to the entrance of the airport at approximately 12:15 p.m. and then departed.

At approximately 1:25 p.m., Elita Woods drove to the airport to meet a cousin who was to have been travelling with Mrs. Harris from St. Kitts to St. Thomas. Ms. Woods testified that as she approached the airport terminal she saw Mr. Harris sitting in plain view in a cafe located immediately opposite the entrance of the airport terminal. Upon learning that the airline flight from St. Kitts was delayed, Ms. Woods drove back to her job nearby. She later returned to the airport at approximately 1:50 p.m. and saw Mr. Harris sitting on a bench in the area of the terminal where passengers can be seen disembarking from the flights.

Ms. Woods said that she asked Mr. Harris if Mrs. Harris had arrived but he did not respond. Later she asked if the flight had arrived and he responded that the plane had just landed and was taxiing. After their conversation she moved away from where Mr. Harris was sitting and did not see him again.

About ten minutes later, Mrs. Harris deplaned and, in the midst of a conversation with Ms. Woods, asked if she had seen Mr. Harris. Ms. Woods responded that Mr. Harris was in the airport. Ms. Woods testified, however, that she never saw Mr. and Mrs. Harris together and informed Mr. Harris of this when he stopped by her house on September 3, 1989 and asked her if she had seen him take Mrs. Harris from the airport. In response to his questions she also stated that although she had heard a "rumor" that his ex-wife was missing, she had not heard that he was implicated. Mr. Harris ended the conversation on September 3 by saying that his ex-wife had caused him "a lot of problems" and "he didn't care" whether or not they found her.

Raphello Harris, Jr., testified that on August 14, 1989, he left his jobsite and arrived at his father's apartment at around 3:30 p.m. in order to change his clothes before going to his part-time job at a local restaurant. Mr. Harris said that he and his son had arranged beforehand to meet at the apartment so that he could drive his son to work.

Raphello Harris, Jr. gave varying testimony on direct and cross examination that when he arrived at the apartment, Mr. Harris, who never returned to the construction jobsite that day, was either in the midst of mopping the bedroom floor, had just completed mopping the floor, or was taking a mop to the front door. He also observed that Mr. Harris was sweating heavily and "looked like he was crying." He stated further that Mr. Harris remained seated on a homemade bed while he was dressing, which at the time he thought unusual. Raphello Harris, Jr. testified that his father's pant's leg either appeared to have bloodstains, be wet, or have a whitish stain. However, his father showed no scratches, marks, cuts, or any other signs of injury, nor did he complain of any injury.

Raphello Harris, Jr. testified that he never saw his mother in the family apartment on August 14, 1989 or thereafter. When he did not see his mother return to St. Thomas as scheduled on August 15, 1989, he waited a few days before he called his older sister, Marcia Harris, age 20, in St. Kitts to inquire. He learned then, for the first time, that Mrs. Harris had left St. Kitts on August 14, 1989.

On August 19, 1989, Raphello Harris, Jr. returned to his father's apartment and, upon entering, detected a strong scent of blood. He also observed what appeared to be blood spots on the bathroom wall, on the shower curtain, and on the floor around the bed. Upon removing the mattress from the wood box frame of the bed that was also used as a storage chest, he observed that the interior of the chest was filled with blood. Furthermore, two sheets that usually covered the bed were missing.

Raphello Harris, Jr. returned to the apartment on August 22, 1989 and found in a bag a pair of Hawaiian pants and underwear that he thought belonged to his mother. When he spoke to his sister in St. Kitts, she informed him that she had packed the Hawaiian pants and underwear

in her mother's luggage before her mother left St. Kitts on August 14, 1989. She also said that her mother left with several packages to deliver to friends in St. Thomas, including one package for Althea Richards that contained some medicine from her relatives in St. Kitts. Mrs. Richards testified that on August 18, 1989, Mr. Harris delivered the package containing medicine to her home.

On August 25, 1989, according to Raphello Harris, Jr. or on September 1, 1989, according to his friend, Raphello Harris, Jr. and his friend returned to the apartment and took pictures of what they believed were bloodstains on the bed (although the friend added that the photographed substance also appeared to be either red stains or mahogany paint). They delivered the film to the Virgin Islands Police Department whereupon a search warrant was executed for Mr. Harris's house on September 5, 1989. Several items that were seized and sent to the F.B.I. for analysis contained human blood. Neither the pants nor underwear (which were gone when Raphello Harris, Jr. returned to the apartment), nor blood matching, nor any knife or other dangerous weapon was offered into evidence.[1]

According to Detective Reynold Fraser, on September 4, 1989, Mr. Harris called him at the Virgin Islands Police Department's Investigation Bureau and asked to meet him alone in a parking lot. When they met, Mr. Harris said that he had killed Mrs. Harris by accident after picking her up at the airport and confronting her at his home about her relationship with another man in St. Kitts. Mr. Harris said that he held a knife to Mrs. Harris's throat in order to force her to tell the truth. When she told him that she could have any man she wanted, he said that he then realized that he had just killed her with the knife. Mr. Harris stated that the police would never find Mrs. Harris's remains. However, Mr. Harris did not sign a statement and Detective Fraser did not arrest him. On September 10, 1989, Detective Fraser wrote a report documenting Mr. Harris's statement.

The police also made efforts to determine if Mrs. Harris had left St. Thomas after confirming through airline records that Mrs. Harris had arrived and deplaned in St. Thomas and had not made a reservation elsewhere on the same airline. Their investigation included developing a missing person flyer with a photograph of Mrs. Harris that they took to "numerous" airlines at the St. Thomas airport and also sent to the Virgin Islands Daily News. They also learned that Mrs. Harris's mother in St. Croix had not seen nor heard from her daughter. Similarly, a police investigation in St. Kitts in May 1990 turned up no evidence that she had been sighted. Nor was there evidence that her St. Kitts home had been damaged or that she had been injured by Hurricane Hugo in September, 1989.

On September 8, 1989, Detective Fraser encountered Mr. Harris at a laundromat, where Mr. Harris informed him that the police had found some of his ex-wife's blood and had also taken a knife during the execution of their search warrant of his residence. Although Mr. Harris did not tell Detective Fraser the location of his ex-wife's remains, he did say that the knife taken by the police was not the knife he used to kill his ex-wife.

Sometime in September, 1989, before Mr. Harris left the Virgin Islands to go to St. Kitts, Raphello Harris, Jr. and Marcia Harris met their father near a shopping center. According to their testimony, Mr. Harris asked his daughter why she was staring at him and his son responded that it was because of what he did. Mr. Harris then replied: "Because of what I did? You mean because I kill your mother? That's

---

1. The FBI analyzed a total of 41 items. The items that contained human blood included sheets and several pieces of board and wood from the bed. There were insufficient amounts of blood on the other items to determine if they contained human blood. There was not enough blood on any of the items to determine the particular blood type. Because there was no blood sample from Mrs. Harris that could be used for a comparison, even though her particular blood type was known, the FBI did not consider blood typing to be essential and did not pursue further testing.

what you wanted me to say." Mr. Harris then started to cry saying that they knew what their mother "used to do" to him. At this point, an acquaintance approached and the conversation ended. Marcia Harris testified that soon thereafter, during a conversation with her father, she told him that regardless of what pain her mother might have caused him in the past, he "didn't have to do it that way." Mr. Harris responded that she wouldn't understand but that he respected how she felt.

According to Detective Fraser, Mr. Harris left the Virgin Islands for St. Kitts from September 16, 1989 to January 17, 1990 when the police investigation intensified. During his stay in St. Kitts, Mr. Harris had encounters with two witnesses. Janet Richardson, who knew the Harris's for several years, testified to seeing Mr. Harris attempt to strangle his ex-wife in 1984 and hearing him make violent threats to his ex-wife throughout their relationship. She testified that in September, 1989, while she was walking past Mr. Harris's home, he told her that "she was next." When she responded that he was a "murderer," she said that he turned around and smiled and went back inside his home. She explained that she thought that Mr. Harris made the comment because she had told some of Mr. Harris's friends that he had murdered his ex-wife, and that his friends had reported her comments to him. In October, 1989, Mr. Harris also talked with a woman who was taking care of his children and who had requested money to aid in their care. Mr. Harris asked her if his younger daughter had told her that he had killed his ex-wife and she responded no. Mr. Harris then said that "if he did it," nobody knew what he went through and that Marcia and Raphael Harris, Jr. had "let him down."

On January 19, 1990, Mr. Harris visited the Investigation Bureau and informed Detective Fraser that he had returned to St. Thomas to begin life anew and that he was "glad to know" that Mrs. Harris was out of his life. This time Detective Fraser was wearing a hidden tape recorder, but Mr. Harris denied having murdered his ex-wife.

Subsequently, according to Raphello Harris, Jr., Mr. Harris came to visit him. At that time, he told his father that, "no matter how long it takes," he intended to find his mother. Mr. Harris then asked him how was he going to find his mother when "she left here in fifteen pieces."

Other testimony, presented by six of the government's 17 witnesses (including Raphael Harris, Jr., Marcia Harris, and two police sergeants), disclosed evidence of Mr. Harris's violent acts toward Mrs. Harris as well as other marital disputes. The most recent incident was a heated quarrel in July, 1989, in St. Kitts, regarding Mr. Harris's missing deed and some insurance papers. Witnesses also testified that in 1984, in St. Kitts, Mr. Harris tried to strangle Mrs. Harris with a rope, that on another occasion he stabbed her with a knife, and that he committed other acts of physical abuse from 1982 to 1985. Moreover, in 1983, Mr. Harris evicted Mrs. Harris and their children from his home following a domestic argument. On one or more occasions in St. Kitts, Mr. Harris told Mrs. Harris that he would not kill her there because the laws in St. Kitts were too tough. Although no documented report about these violent episodes was ever made to the St. Kitts police apart from the time when Mr. Harris evicted his wife and children, one St. Kitts police officer testified that in May or June, 1986, Mrs. Harris reported her husband for beating her and threatening her life.

In turn, Raphello Harris, Jr. testified that Mrs. Harris had twice (in 1982 and 1986) abandoned both Mr. Harris and the children and that once Mr. Harris had to seek the assistance of the St. Kitts police department to locate her. Other testimony, however, indicated that Mrs. Harris left for fear that her husband might harm her.

II.

On March 16, 1990, the Government of the Virgin Islands filed a two-count information charging Mr. Harris with murder in the first degree (count I) and possession of a dangerous weapon during the commission of a crime of violence (count II), in violation

of V.I. Code Ann. tit. 14, §§ 922(a)(1) and 2251(a)(2),[2] respectively.

A jury trial commenced on July 9, 1990. At the close of the government's case and once again at the close of all the evidence, Mr. Harris moved for a judgment of acquittal under Fed.R.Crim.P. 29 on both counts on the basis that the government failed to establish a *prima facie* case. The motions were denied.

Mr. Harris was convicted of both counts and sentenced to life imprisonment without parole (first degree murder) and five years imprisonment (weapon possession). This appeal is based on the district court's denial of Mr. Harris's motions for judgment of acquittal and the court's "various procedural errors."

### III.

 In reviewing the denial of a motion for judgment of acquittal based on insufficiency of the evidence, we "must sustain the verdict if there is substantial evidence, viewed in the light most favorable to the Government, to uphold the jury's decision." · *Burks v. United States,* 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978) (citing *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942)); *Government of the Virgin Islands v. Ramos,* 730 F.2d 96, 98 (3d Cir.1984). Considering the evidence in this light, together with "legitimate inferences to be drawn therefrom," we determine whether a rationale trier of fact could have found guilt beyond a reasonable doubt. *United States v. McNeill,* 887 F.2d 448, 450 (3d Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1152, 107 L.Ed.2d 1055 (1990); *Government of the Virgin Islands v. Joseph,* 770 F.2d 343, 345 (3d Cir.1985). We review for abuse of discretion a decision on

the admission of evidence under Fed.R. Evid. 403, *see United States v. Driggs,* 823 F.2d 52, 54 (3d Cir.1987), and Fed.R.Evid. 404(b). *See Government of the Virgin Islands v. Joseph,* 685 F.2d 857, 860–61 (3d Cir.1982).

### IV.

Mr. Harris contends that the district court erred in denying his motion for judgment of acquittal and submitting the case to the jury because: (1) the government failed to establish the corpus delicti of the homicide; (2) Mrs. Harris's body was never found; (3) Mr. and Mrs. Harris were not seen together on the day that she was allegedly murdered; and (4) there was "plausible evidence" that Mrs. Harris voluntarily left the jurisdiction because she had left her family twice before. Mr. Harris also claims that the court erred in submitting to the jury the charge of possession of a dangerous weapon during the commission of a crime of violence. He states that no weapon of any kind was identified or admitted into evidence and the only reference to a weapon was Detective Fraser's statement describing his alleged conversations with Mr. Harris about a knife.

Mr. Harris also maintains that the court erred in admitting evidence of his past acts of threats or violence toward his ex-wife because the government did not establish that the alleged acts occurred or that Mr. Harris committed these acts. Furthermore, he asserts that the probative value of the acts was "far outweighed" by its prejudicial effects.

The government contends, however, that the facts and circumstantial evidence in this case established the corpus delicti for the charge of first degree murder. More-

---

**2.** Section 922(a)(1) provides in part:

(a) All murder which—
(1) is perpetrated by means of poison, lying in wait, torture or by any other kind of willful, deliberate and premeditated killing;
(2) ... is murder in the first degree.

V.I.Code Ann. tit. 14, § 922(a)(1).

Section 2251(a)(2) provides in part:

(a) Whoever—
(1) has, possesses, bears, transports, carries or has under his proximate control any instru-

ment or weapon of the kind commonly known as blackjack, billy, sandclub, metal knuckles, bludgeon, switchblade knife or gravity knife or electric weapon or device; or
(2) with intent to use the same unlawfully against another, has, possesses, bears, transports, carries or has under his proximate control, a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly weapon shall ...

V.I.Code Ann. tit. 14, § 2251(a)(2).

over, Mr. Harris's "admissions both to the police and his children proved beyond a reasonable doubt that he killed [his ex-wife]." The government also claims that Mr. Harris's "admission of the means used to kill his ex-wife is corroborated by circumstantial evidence that there was a homicide and that he was the responsible party." For example, Raphello Harris, Jr.'s discovery of what appeared to be human blood on Mr. Harris's clothing and the subsequent discovery of human bloodstains on several items in Mr. Harris's home corroborated his admission that he held a knife to his wife's throat, killed her, and that she "left in fifteen pieces."

The government also maintains that the district court properly admitted evidence of Mr. Harris's prior acts against his wife to show Mr. Harris's motive for the killing and that Mrs. Harris's death did not result from an accident or suicide. Mr. Harris's statements in the past indicating that he would kill his wife in a place other than St. Kitts were also probative of his intent and preparation, as well as the background for the crime charged.

Viewing the evidence in the light most favorable to the government, we examine the parties' contentions based upon the direct and circumstantial evidence presented, and Mr. Harris's alleged admissions or exculpatory statements.

### A.

■ The corpus delicti, defined as "the body or substance of the crime charged," has two components: (1) an unlawful injury, and (2) an individual's unlawful conduct as a source of that injury. Establishing a corpus delicti requires proof that a specific injury, loss, or harm resulted, and that the injury was caused by a criminal agency rather than by an innocent or accidental one. *See* 1 C. Torcia, *Wharton's Criminal Evidence* § 28 (14th ed. 1985 & Supp.1990); 7 J. Wigmore, *Evidence* § 2071 (Chadbourn rev.ed. 1978 & Supp.1990).

■ To establish a corpus delicti, the government need only prove that a crime has been committed. *United States v. Di Orio*, 150 F.2d 938, 939 (3d Cir.), *cert. denied*, 326 U.S. 771, 66 S.Ct. 175, 90 L.Ed. 465 (1945). Identifying the defendant as the perpetrator of the crime is not required. *See United States v. Wilson*, 529 F.2d 913, 915 (10th Cir.1976) (citing *United States v. Charpentier*, 438 F.2d 721, 725 (10th Cir.1971)); *Commonwealth v. Elder*, 305 Pa.Super. 49, 51, 451 A.2d 236, 237 (1982). Moreover, proof of the corpus delicti may be based on circumstantial evidence. *Di Orio*, 150 F.2d at 941.

Most corpus delicti cases have involved homicides where, typically, the prosecution must show that: (1) a human being is dead (rather than simply disappeared, in those circumstances where no body has been produced, to ensure that the victim will not reappear alive and well at a later time); and (2) the death can be attributed to another's unlawful conduct (rather than by accident, suicide, or natural causes). W. LaFave & A. Scott, *Criminal Law* § 1.4 (2d ed. 1986); 1 C. Torcia, *supra* § 228.

Courts have relied on circumstantial evidence in proving the corpus delicti for first degree murder in both federal[3] and state[4] court cases, including the Virgin Islands. *See, e.g., Government of the Virgin Is-*

---

**3.** *See, e.g., United States v. Stabler*, 490 F.2d 345, 350 (8th Cir.1974) (upholding conviction even though "none of the stated independent evidence associates the defendant with the commission of the crime"); *Smith v. Texas*, 329 F.2d 498, 500 (5th Cir.1964) (stating that the corpus delicti for first degree murder may be proven by circumstantial and direct evidence); *Smith v. United States*, 283 F.2d 607, 608 (D.C.Cir.1960) (presenting circumstantial evidence of death), *cert. denied*, 364 U.S. 938, 81 S.Ct. 387, 5 L.Ed.2d 369 (1961); *Beasley v. Holland*, 649 F.Supp. 561, 568–69 (S.D.W.Va.1986) (circumstantial evidence provided was sufficient to establish the

corpus delicti of murder), *cert. denied*, 488 U.S. 860, 109 S.Ct. 156, 102 L.Ed.2d 127 (1988).

**4.** All the state court "no-body-required" cases that we researched relied predominantly if not completely on circumstantial evidence to prove the corpus delicti of homicide. *See, e.g., Commonwealth v. Kysor*, 334 Pa.Super. 89, 93, 482 A.2d 1095, 1097 (1984) ("[I]t is not necessary to produce the body to acquire a homicide conviction. Circumstantial evidence may be so convincing that it alone can satisfy the Commonwealth's burden to prove guilt beyond a reasonable doubt.").

lands v. Roldan, 612 F.2d 775, 781 (3d Cir.1979) (noting that a first degree murder conviction under the Virgin Islands Code may be based on circumstantial evidence; "indeed, premeditation generally can be proved only by such evidence"), *cert. denied*, 446 U.S. 920, 100 S.Ct. 1857, 64 L.Ed.2d 275 (1980); *Government of the Virgin Islands v. Felix*, 569 F.2d 1274, 1283 (3d Cir.1978) (upholding first degree murder conviction based upon testimony including defendant's arguments and statements on the day of the shooting).

■ Historically, the corpus delicti doctrine incorporated the "almost-universal American rule" that in order to convict a defendant of a crime based upon an extrajudicial confession or admission,[5] the defendant's statement must be corroborated by some evidence of the corpus delicti. W. LaFave & A. Scott, *supra* § 1.4.[6] The major purpose of this rule is to prevent "errors in conviction based upon untrue confessions alone." *Warszower v. United States*, 312 U.S. 342, 347, 61 S.Ct. 603, 606, 85 L.Ed. 876 (1941); *see also* Comments, *Corroborating Confessions: An Empiri-*

*cal Analysis of Legal Safeguards Against False Confessions*, 1984 Wis.L.Rev. 1121, 1155 (concluding that "physically uncoerced false confessions occur with sufficient regularity to justify prophylactic measures"). However, "[a] confession, especially one that survives the multiple attacks that can be made upon its admissibility, has traditionally been regarded as extraordinarily reliable evidence of the defendant's guilt." E. Cleary, *McCormick on Evidence* § 144 at 364 (3d ed. 1984 & Supp. 1987). Thus, the "high probative value" of a confession and the opportunities available to attack it at trial can support its admission into evidence. *Id.*

Most jurisdictions today follow the original corpus delicti doctrine requiring proof *aliunde* (from another source) that a crime has occurred. However, the federal courts and a number of state courts have adopted the "trustworthiness" doctrine that emphasizes the reliability of the defendant's confession over the independent evidence of the corpus delicti. *Id* § 145. Under the "trustworthiness" doctrine, direct proof of the corpus delicti is not required; the evi-

---

**5.** For simplicity, we use the terms "confession" and "admission" interchangeably.

A confession is a statement admitting or acknowledging all facts necessary for conviction of the crime. An admission, on the other hand, is an acknowledgment of a fact or facts tending to prove guilt which falls short of an acknowledgment of all essential elements of the crime. *Black's Law Dictionary* 156 (5th ed. 1983). In *Opper v. United States*, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954), the Supreme Court applied the corroboration rule to both confessions and admissions, emphasizing that both had the same possibility for error. *Id.* at 92, 75 S.Ct. at 164. The Court noted that "[c]onfessions are ... only one species of admissions; and all other admissions than those which directly touch the fact of guilt are without the scope of the peculiar rules affecting the use of confessions." *Id.* at 91 n. 7, 75 S.Ct. at 163 n. 7 (quoting 3 J. Wigmore, *Evidence* § 821 (3d ed. 1940)). The *Opper* Court also applied the corroboration rule to "exculpatory statements," i.e., "those that explain actions rather than admit guilt," *id.*, because the Court considered them as unreliable as other extrajudicial statements. *Id.; see also* Comments, *Corroborating Confessions: An Empirical Analysis of Legal Safeguards*, 1984 Wisc.L.Rev. 1121, 1131–32 (defining "exculpatory statements" as those that are accompanied by an express denial

of guilt but that are in fact inculpatory"). The majority of courts rely on *Opper*'s broad definition of "confessions." *See* Comments, *supra*, at 1132.

**6.** The corpus delicti doctrine generally governs the admissibility of evidence, not the sufficiency of evidence to convict. *See, e.g.*, E. Cleary, *McCormick on Evidence* § 145 (3d ed. 1984 & Supp.1987) (reviewing case law holding that an extrajudicial confession cannot be admitted into evidence unless it is accompanied by some corroborating evidence). Whether a confession has been sufficiently corroborated to be admitted into evidence is a question of fact that we review under a clearly erroneous standard. *See, e.g., Sligh v. Doe*, 596 F.2d 1169, 1171 (4th Cir.1979). However, corroboration is a factor to be considered in weighing the sufficiency of evidence. Therefore, if we determine that the admission is not clearly erroneous, we next decide whether a rational trier of fact could have found the defendant guilty based on the confession and the corroborating evidence. *See, e.g., United States ex rel. Hayward v. Johnson*, 508 F.2d 322, 330 (3d Cir.) (noting the court's need to decide two separate questions: the admissibility of the confession based upon the extent of corroboration and the general sufficiency of the evidence to support a jury's inference that the confession was truthful), *cert. denied*, 422 U.S. 1011, 95 S.Ct. 2637, 45 L.Ed.2d 675 (1975).

dence may even be collateral to the crime itself. "The corroboration, however, directly relates to the trustworthiness of the important facts contained in the defendant's statement, whereas the corpus delicti version is more concerned with the elements of the offense." B. Reeve, State v. Parker: *North Carolina Adopts the Trustworthiness Doctrine,* 64 N.C.L.Rev. 1285, 1291 (1986).[7]

The United States Supreme Court adopted the trustworthiness doctrine as the "best rule" in two companion cases: *Opper v. United States,* 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954) and *Smith v. United States,* 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192 (1954). In *Opper,* the Court rejected the original corpus delicti doctrine, holding instead that confessions, admissions, and exculpatory statements must be corroborated by "substantial independent evidence which would tend to establish the trustworthiness of the statement." 348 U.S. at 93, 75 S.Ct. at 164. The Court considered it to be "sufficient if the corroboration supports the essential facts admitted sufficiently to justify a jury inference of their truth." *Id.* By requiring the government to produce "substantial independent evidence," the Court used this evidence to serve a "dual function ... make the admission reliable, thus corroborating it while also establishing independently the other necessary elements of the offense." *Id.; see also* E. Cleary, *supra* § 145, at 371 (Under *Opper* and *Smith,* "the prosecution's use of a defendant's self-incriminating out-of-court statement, no matter how narrowly incriminating, should quite clearly not give rise to any broad duty such as that to establish by some sort of independent evidence all elements of the corpus delicti.").

Applying federal law, we adopted the trustworthiness doctrine in *United States*

*v. Wilson,* 436 F.2d 122 (3d Cir.), *cert. denied,* 402 U.S. 912, 91 S.Ct. 1393, 28 L.Ed.2d 654 (1971), where we held there was "substantial independent evidence" to corroborate the defendant's admission to a detective that he drove the automobile in question from Philadelphia to California. *Id.* at 124.

> Since two parts of [the defendant's] admission were corroborated by other evidence, this established the trustworthiness of the entire admission and authorized the prosecutor to prove the element of interstate transportation solely by [the defendant's] admission that he drove [the car] from Philadelphia to California.... The corroborative evidence need not be sufficient, independent of the statements of the accused, to establish the corpus delicti, and what the government must do, in order to furnish sufficient corroboration, is to introduce substantial evidence which would tend to establish the trustworthiness of the statement.

*Id.* (citing *Opper v. United States,* 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954)); *see also United States v. Felder,* 572 F.Supp. 17, 22 (E.D.Pa.), *aff'd,* 722 F.2d 735 (3d Cir.1983) (stating that corroboration may be established in a number of ways, including the "detailed nature of the confession itself, or in the recital of facts that would be unknown to anyone other than the criminal.") Under *Opper,* such proof must be shown beyond a reasonable doubt. 348 U.S. at 93, 75 S.Ct. at 164.

### B.

Both parties note that this is a case of first impression in the Virgin Islands. There is no reported first degree murder case where the body has not been found. The Virgin Islands statutes are also silent on whether a body must be found and

---

**7.** One review of the case law on this issue suggests that the trustworthiness doctrine and the corpus delicti doctrine lead to "identical results" in many cases. Notes, *Confession Corroboration in New York: A Replacement for the Corpus Delicti Rule,* 46 Fordham L.Rev. 1205, 1219 (1978); *see also* Comments, *supra,* at 1147 (stating that the trustworthiness doctrine is "as strict or stricter" than the corpus delicti doctrine in excluding confessions). The advantage of the trustworthiness doctrine "lies in its simplicity and its direct bearing on the reliability of the facts stated in the confession or admission." Notes, *supra,* at 1219; *see also* E. Cleary, *supra* § 145, at 371 (stating that, in contrast to the trustworthiness doctrine, the "traditional requirement of independent proof of the corpus delicti seems fraught with opportunity for needless dispute").

identified to prove the corpus delicti of homicide although, as we have noted, a first degree murder conviction under the Virgin Islands Code may be based on circumstantial evidence. *See Government of the Virgin Islands v. Roldan,* 612 F.2d 775, 781 (3d Cir.1979), *cert. denied,* 446 U.S. 920, 100 S.Ct. 1857, 64 L.Ed.2d 275 (1980).

▄▄ Absent governing statute or precedent, a "hierarchy of sources for Virgin Islands law" is found under V.I. Code Ann. tit. 1, § 4 (1967).[8] *Edwards v. Born, Inc.,* 792 F.2d 387, 389 (3d Cir.1986). Under § 4, we look first to the common law rules set forth in the various *Restatements.* If no rules are available, we look next to the common law rules "as generally understood and applied in the United States." *Id. See also Polius v. Clark Equipment*

*Co.,* 802 F.2d 75, 77 (3d Cir.1986) (Where the Virgin Islands "has no governing statute ... [and] [w]here the Restatement is silent and a split of authority exists, courts should select the sounder rule."). Therefore, in our analysis of this case and our application of the trustworthiness doctrine, we look to the common law rules.[9] Furthermore, we explicitly adopt the trustworthiness doctrine in the Virgin Islands for evaluating the reliability of statements.

▄▄ Historically, the production of the body of a missing person was generally not required under the common law in order to establish the corpus delicti for homicide. *See* Perkins, *The Corpus Delicti of Murder,* 48 Va.L.Rev. 173, 179 (1962). With few exceptions,[10] this "no-body-required" rule applies today in both federal[11] and state law cases[12] including Pennsylvania[13]

**8.** Section 4, Application of common law; restatements, states:

The rules of common law, as expressed in the restatements of the law approved by the American Law Institute, and to the extent not so expressed, as generally understood and applied in the United States, shall be the rules of decision in the courts of the Virgin Islands in cases to which they apply, in the absence of local laws to the contrary.
V.I.Code Ann. tit. 1, § 4 (1967).

**9.** Although we uniformly apply V.I.Code Ann. tit. 1, § 4 in civil cases, we rarely encounter its application in criminal cases. It could be argued that we should first look to the Model Penal Code which, although not technically a *Restatement,* is prepared by the American Law Institute. However, the Model Penal Code is also silent on this issue.

**10.** Under the old Texas Penal Code, one of the elements of the corpus delicti of murder in Texas was that the body of the deceased "must be found and identified." *See, e.g., Smith v. Texas,* 329 F.2d 498, 501 (5th Cir.1964). Tex.Penal Code Ann. art. 1204 (Vernon 1925) provided: "No person shall be convicted of any grade of homicide unless the body of the deceased, or portions of it, are found and sufficiently identified to establish the fact of the death of the person charged to have been killed." In 1974, Texas repealed the requirement that a victim's body be found in order to prove the corpus delicti of homicide. *See, e.g. Williams v. State,* 629 S.W.2d 791, 796 (Tex.Ct.App.1981) (noting the omission of the body-must-be-found requirement under the new Texas Penal Code). Regardless, the Texas Court of Criminal Appeals still requires that the body of the deceased be found and identified. *See, e.g., Harris v. State,*

738 S.W.2d 207 (Tex.Crim.1986) (holding that homicide victim's body must be found and identified), *cert. denied,* 484 U.S. 872, 108 S.Ct. 207, 98 L.Ed.2d 158 (1987); *Penry v. State,* 691 S.W.2d 636 (Tex.Crim.1985) (same), *cert. denied,* 474 U.S. 1073, 106 S.Ct. 834, 88 L.Ed.2d 805 (1986). *But see* Wheeler, *Invitation to Murder? Corpus Delicti, Texas Style,* 30 S.Tex.L.Rev. 267, 268–69 (1989) (discussing the peculiarities of the body-must-be-found requirement followed by the Texas Court of Criminal Appeals).

**11.** There are relatively few cited federal cases; most are state law cases. *See, e.g., United States v. Stabler,* 490 F.2d 345, 346 (8th Cir.1974) (holding that circumstantial evidence was sufficient to establish the corpus delicti of the victim's murder: the victim was last seen on the Indian reservation in a car that was soon thereafter set on fire; the charred and unidentifiable body found in the car was human; and the victim had not been seen in the community since the fire occurred).

**12.** The following states hold that the body of a missing person need not be produced to convict for murder: Alabama, Arkansas, California, Illinois, Indiana, Kansas, Kentucky, Maine, Maryland, Michigan, Mississippi, Montana, New Jersey, New York, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Texas, Utah, Virginia, and Washington. We have cited only those published state law cases where the victim disappeared and was never heard from again and where a body was never produced or, in a minority of cases, the body was in a condition beyond any possible means of identification except that it was human. *See Gilchrist v. State,* 466 So.2d 988 (Ala.App.1984) (defendant made

**13.** See note 13 on page 414.

statements to his common law wife that he struck victim in the head with a large stick and then hid her body; victim had not contacted friends or family or picked up her paycheck; there was no evidence that victim was unhappy or contemplated suicide); *Lewis v. State*, 220 Ala. 461, 125 So. 802 (1930) (defendant admitted to police that he and others murdered the 70 year-old victim in the woods with an ax, found with bloodstains and white hairs; witness saw the murder; ashes found nearby containing fragments of bone and victim's clothing); *Derring v. State*, 273 Ark. 347, 619 S.W.2d 644 (1981) (defendant told acquaintances and cell-mate he had shot and killed a man, had thrown him in a river or a ditch, and was found driving the man's car; victim was last seen stopping his car on a highway talking to a black man; defendant, who was black, was seen on highway near that time; defendant attempted to sell victim's car containing papers and a bible with victim's name on them; defendant had gun at time of arrest; victim was dependable, religious, kept to a rigid schedule, frequently contacted family and friends); *People v. Manson*, 71 Cal.App.3d 1, 139 Cal.Rptr. 275 (2nd Dist.1977) (defendant made statements to witnesses that he and others killed victim, that "they cut him up in nine pieces and buried him under some leaves" and that they cut his head off; witness heard defendant asking for lye to get rid of the body and had heard victim screaming the night before; victim's car and possessions were found), *cert. denied*, 435 U.S. 953, 98 S.Ct. 1582, 55 L.Ed.2d 803 (1978); *People v. Scott*, 274 Cal.App.2d 905, 79 Cal.Rptr. 587 (2nd Dist.1969) (defendant made statements that he had "gotten rid" of victim, his common law wife, and that he had shot her; defendant and victim had been heard arguing several times each month; defendant asked witness to carry a heavy cardboard box to his car and to help him bury it; on same weekend defendant sold victim's clothing and a rifle; victim ceased communication with family and did not show up for work); *People v. Bolinski*, 260 Cal.App.2d 705, 67 Cal.Rptr. 347 (4th Dist. 1968) (defendant made no admission; defendant was found by police driving victim's car and using his credit cards and cash; defendant said that victim picked him up while he was hitchhiking and loaned him the car; no weapon was found although defendant was known to have been armed with a revolver when he began hitchhiking; victim was soon to receive a retirement pension); *People v. Scott*, 176 Cal.App.2d 458, 1 Cal.Rptr. 600 (1959) (defendant made no admission; stated that victim, his wife, who had supported him, drove away one afternoon and never returned; no weapon uncovered; victim's dentures and glasses were buried near her home; victim in excellent mental and physical health although defendant told friends she was ill; defendant "pleased and satisfied" when wife left and spoke ill of her; tried to prevent investigation of his efforts to steal her large estate; fled country in fear of murder charge), *cert. denied*, 364 U.S. 471, 81 S.Ct. 245, 5 L.Ed.2d 222 (1960); *People v. Cullen*, 37 Cal.2d 614, 234 P.2d 1 (1951) (defendant made statements to police and witness that defendant's wife and father-in-law, with whom he lived, had died in their house and that he knew where the bodies were; he hoped the police "wouldn't get anywhere because they had no corpus delicti"; defendant forged his father-in-law's pension check; bloody clothing was found in the home and wet spots of human blood on the carpet; attempt was made to sand the floor and wash off the blood); *People v. McMonigle*, 29 Cal.2d 730, 177 P.2d 745 (1947) (defendant made written admission to police that he enticed victim, 14-year-old girl, into his car with false story; shot victim and dropped her body over a cliff into the ocean; police found blood-stained articles, gun, and victim's clothing and possessions; defendant stole serviceman's clothing that he wore on day of murder); *People v. Faulkner*, 186 Ill.App.3d 1013, 134 Ill.Dec. 683, 542 N.E.2d 1190 (1989) (defendant made no admission; defendant's son and daughter said that they saw defendant dump victim's body in a reservoir; son said that he saw defendant stab victim while victim was having sex with defendant's wife; red stains were found on mattress and trunk of defendant's car although blood tests were negative); *Campbell v. State*, 500 N.E.2d 174 (Ind.1986) (defendant admitted to crime on tape; accomplice testified that badly beaten victim was held under water and was last seen floating down the river; unsuccessful search for body did not begin until four years later; victim not seen since day of attack); *State v. Pyle*, 216 Kan. 423, 532 P.2d 1309 (1975) (defendant admitted to police and others burning victim's (his grandmother) home while she was inside or killing her in a gruesome way and disposing of her body elsewhere; no physical evidence of victim's body in ashes; defendant and victim had strained relations; defendant believed he was the primary beneficiary of victim's will; defendant attempted suicide; made inconsistent statements); *Gibson v. Commonwealth*, 301 Ky. 402, 192 S.W.2d 187 (1946) (defendant made no admission; victim's (defendant's neighbor) house had been burned and skeleton with bullet in head was thought to be victim; victim's money box was open; defendant had one of victim's guns and extra money); *Warmke v. Commonwealth*, 297 Ky. 649, 180 S.W.2d 872 (1944) (defendant confessed that she threw her baby into a flooded creek then stated it was accidental; child was illegitimate and defendant said she would be humiliated to go home; a coat the baby was wrapped in had been found); *Hurley v. State*, 60 Md.App. 539, 483 A.2d 1298 (1984) (defendant made no admission; daughter of defendant and victim (defendant's estranged wife) heard a scream and saw victim on floor of defendant's office; defendant made inconsistent statements concerning victim's disappearance; since disappearance, victim did not contact friends or family although defendant's evidence suggested that wife was suicidal and capable of disappearing without notification), *cert. denied*, 302 Md. 409, 488 A.2d 500 (1985); *State v. Hicks*, 495 A.2d

765 (Me.1985) (defendant made no admission; evidence introduced that victim, defendant's wife, screamed on the morning of her disappearance that defendant was killing her and her body was awkwardly positioned on a seat later that morning with hair covering her face; defendant's behavior was peculiar on morning and his statements inconsistent about victim's location; no weapon or bloodstains were found; victim absent for six years; victim had made specific commitments with friends and family; loving mother); *People v. Modelski*, 164 Mich. App. 337, 416 N.W.2d 708 (1987) (defendant admitted to friends, a paramour, and police that he had shot and killed victim, his wife, in a rage following an argument, and then dumped the body; relationship was stormy with frequent arguments, instances of violence, and defendant's accusations that victim was unfaithful; marriage was deteriorating), *appeal denied,* 1987 WL 24489, 1988 Mich. LEXIS 836 (Mich. 1988); *King v. State,* 251 Miss. 161, 168 So.2d 637 (1964) (defendant made no admission; defendant was arguing with victim, who had bought whiskey from him; three witnesses saw defendant beat victim whose "head was mashed in" and who had ceased breathing; witness helped defendant bury body but body could not be found later); *State v. Lamb,* 28 Mo. 218 (1859) (defendant made written admission that he never recanted stating that he drowned his wife in a river and tied down her body with stones; his prior attempts to poison her had made her ill; he soon married another woman; he said his wife was not his equal); *People v. Curro,* 161 A.D.2d 784, 556 N.Y.S.2d 364 (2d Dept.) (defendant stated to brother that he had strangled victim and cut her body into pieces in a bathtub, put them in a bag and "took them for a ride;" defendant believed victim, his girlfriend, was informing on him about drug dealing; relatives had not heard from victim for six years since her disappearance), *appeal denied,* 76 N.Y.2d 855, 560 N.Y.S.2d 994, 561 N.E.2d 894 (1990); *People v. Seifert,* 152 A.D.2d 433, 548 N.Y.S.2d 971 (App.Div., 4th Dept.1989) (defendant made statement that he would kill victim, his brother, who had filed criminal charges against him; long history of hatred between brothers; defendant had lured brother to rural site where human blood (of brother's type) and brain tissue were found), *appeal denied,* 75 N.Y.2d 924, 555 N.Y.S.2d 43, 554 N.E.2d 80 (1990); *People v. Lipsky,* 57 N.Y.2d 560, 457 N.Y.S.2d 451, 443 N.E.2d 925 (1982) (defendant admitted murder of victim, a prostitute, whose body he had dumped in a gully; victim's belongings had been found in defendant's apartment), *later appealed,* 103 A.D.2d 1033, 478 N.Y.S.2d 441 (4th Dept.1984); *State v. Nicely,* 39 Ohio St.3d 147, 529 N.E.2d 1236 (1988) (defendant made no admission; defendant and victim, his wife, had stormy marriage and victim wanted to leave him the night of her disappearance; human blood of victim's type was found on defendant's pants and other items as well as in and around victim's car, which defendant had abandoned; bag containing some of victim's items was found weighted in a creek); *State v. Dudley,* 19 Ohio App.2d 14, 48 Ohio Op.2d 19, 249 N.E.2d 536 (1969) (defendant made no admission; defendant at plant the night victim, a plant watchman disappeared; bloodstains were found in the plant, on victim's car and cap, and defendant's pants; defendant burned his pants and shoes; defendant seen with a crowbar which had some of victim's hair; witness saw defendant argue with victim and hit him with crowbar); *Arnold v. State,* 803 P.2d 1145 (Okla. Crim.1990) (defendant admitted to ex-wife and others that he had murdered victim while victim was sleeping in his car; victim had made violent threats toward defendant's stepdaughter; defendant was seen with blood and dirt on his pants the day victim disappeared and defendant stored and stripped victim's car); *Rawlings v. State,* 740 P.2d 153 (Okla.Crim.1987) (defendant made no admission; had told victim, his wife, whom he had beaten in the past, that next time she saw him she "would be dead;" near time of victim's disappearance, defendant purchased and used a gun, rented a car and plane, moved victim's possessions, wrote letters on her behalf, and possessed a suitcase with her belongings; human blood was found on the car, plane, and gun); *State v. Brown,* 310 Or. 347, 800 P.2d 259 (1990) (defendant told cellmate he had disposed of victim's body; had threatened to kill victim, a prospective witness in a case against him; victim was last seen being forced to leave her house with him; victim had not contacted her relatives and left possessions behind); *State v. Lerch,* 63 Or.App. 707, 666 P.2d 840 (1983) (defendant, a prison escapee, confessed that he had strangled victim, a seven-year-old boy and put his body in a dumpster; witness testified he had smelled the odor of decomposing human flesh coming from the dumpster; hair similar to victim's was found in defendant's home), *aff'd* 296 Or. 377, 677 P.2d 678 (1984); *State v. Williams,* 46 Or. 287, 80 P. 655 (Or.1905) (defendant made no admission; lived with victims, his wife and mother-in-law, and gave inconsistent reasons for their disappearance; married another woman whose name he said was that of his wife; forged a check with his wife's name and took over her land; finding of human blood and hair); *State v. Owens,* 293 S.C. 161, 359 S.E.2d 275 (defendant made statements to police investigator and three inmates indicating knowledge of victim's death and location of his body; victim, 72–years–old, was last seen at his residence where there were signs of a struggle; dragmarks, human bloodstains, victim's eyeglasses and needed medication, found at his residence; victim was dependable and had standing appointments; defendant picked up ransom money and his daughter and son sold victim's possessions; hairs similar to victim's found in defendant's car trunk), *cert. denied,* 484 U.S. 982, 108 S.Ct. 496, 98 L.Ed.2d 495 (1987); *Williams v. State,* 629 S.W.2d 791 (Tex.Ct.App.1981) (defendant admitted shooting and killing victim at trial and helping to conceal the body thereafter; eye-witness testified as to shooting and a neigh-

bor called police about seeing body put in car trunk; defendant refused to let police inside his home); *State v. Rebeterano,* 681 P.2d 1265 (Utah 1984) (no admission from defendant, ex-husband of witness, who became jealous because witness and victim were talking in a bar; witness heard defendant and victim scuffling and a groan; observation that defendant placed a large, wrapped bundle in victim's automobile; large amounts of type A blood found in witness's apartment and in trunk of victim's automobile; kitchen knife found on roof of victim's home); *Epperly v. Commonwealth,* 224 Va. 214, 294 S.E.2d 882 (1982) (defendant made no admission but made incriminating statements, such as a reference to victim's "body" before anyone thought she was dead; victim last seen with defendant whom she had just met; evidence of violent struggle and savage beating of victim; victim's hidden, blood-soaked clothing; human bloodstains and hair in home; defendant's lack of remorse and efforts to avoid detection; dog-tracker led to defendant's front door; victim's highly modest and careful conduct, close contact with family and friends); *State v. Neslund,* 50 Wash.App. 531, 749 P.2d 725 (1988) (defendant told niece and brother that she and their other brother had killed victim, her husband; witness-brother overheard conversations between defendant and other brother describing how victim had been shot, butchered, burned, and disposed of; blood was found on defendant's handgun and in home; victim indicated that he was afraid of defendant and feared for his life; defendant was familiar with firearms); *State v. Quillin,* 49 Wash.App. 155, 741 P.2d 589 (1987) (defendant admitted felony murder of robbery victim to police and to witnesses; took police to homicide scene where body had been thrown from bridge; knife thrown from car was not recovered but some of victim's possessions were); *State v. Lung,* 70 Wash.2d 365, 423 P.2d 72 (1967) (defendant signed statement admitting he "accidentally" shot his wife and disposed of her body in the river; victim's car contained some personal possessions including her coat which had a bullet hole and human bloodstains; defendant returned victim's car to its usual place; attempted to remove bloodstains in his home; returned rifle to his workshop); *but see Lemons v. State,* 49 Md.App. 467, 433 A.2d 1179 (1981) (reversing first degree murder conviction for insufficient evidence independent of defendant's statements to establish corpus delicti; defendant, who was mentally unstable and had a history of drug and alcohol abuse, told police, his girlfriend, and girlfriend's daughter details about how he killed victim and disposed of her body eleven years earlier; victim had disappeared near the time defendant stated killing occurred; defendant said he desecrated the grave of another woman and grave was found to have been desecrated; psychiatrists stated that defendant could not tell between fantasy and reality; employer said victim was unreliable; state made limited efforts to attempt to locate victim or to find if anyone had reported her missing); *Campbell v. People,* 159 Ill. 9, 42 N.E. 123 (1895) (reversing murder conviction for insufficient evidence; defendant made no admission; conviction was based primarily on unmarried witness's inconsistent testimony that defendant, who was married, was the father of her baby and took the baby from her directly after its birth and she never saw it again; witness told defendant's friend that the baby was born dead; witness was jealous of defendant's wife).

**13.** *See, e.g., Commonwealth v. Smith,* 523 Pa. 577, 568 A.2d 600 (1989) (defendant made no admission; circumstantial evidence was sufficient to present jury question that defendant was guilty of the murder of victim and her children: finding of victim's pin and hair in defendant's car and home, respectively, and defendant's comb under her body; testimony that victim's children were last seen with victim and never found despite nationwide FBI search; this case reversed an earlier conviction that had improperly relied on hearsay testimony); *later appealed,* —— Pa.Super. ——, 591 A.2d 730 (1991); *Commonwealth v. Burns,* 409 Pa. 619, 187 A.2d 552 (1963) (defendant told several persons that he had "cut her [victim] up and put her in the trash" or "buried her in the cellar"; friend last saw victim, defendant's girlfriend and housemate, lying on the floor with blood on her head; defendant's son saw defendant hit victim in the head with a hammer; victim ceased pattern of activities and contacts with friends); *Commonwealth v. Lettrich,* 346 Pa. 497, 31 A.2d 155 (1943) (defendant made admission to police that she suffocated her sister's eight-day-old, illegitimate, baby and burned the body in the furnace; was last seen with the baby; father denied defendant's statement that she had given the baby to him); *Commonwealth v. Jones,* 297 Pa. 326, 146 A. 905 (1929) (voluntary manslaughter conviction; defendant admitted to police that he shot victim, his wife, then set fire to abandoned farmhouse with victim's body inside; ashes of burned farmhouse contained pieces of human bone, clothing, and jewelry resembling victim's; human bloodstains near grounds of farmhouse; defendant burned his wife's clothing in home furnace, where clothing parts were found in ashes; defendant indifferent to wife's disappearance; no evidence confession involuntarily made). *But see Commonwealth v. Kysor,* 334 Pa.Super. 89, 482 A.2d 1095 (1984) (prior to finding victim's body, circumstantial evidence was insufficient for probable cause for arrest or conviction of homicide (precluding defendant's double jeopardy claim): victim was last seen alive with defendant, a companion; defendant was arrested while driving victim's car; explanations for how defendant got the car were disproved; victim never again contacted relatives or friends after his evening with defendant).

and New Jersey.[14] *See, e.g., St. Clair v. United States,* 154 U.S. 134, 152, 14 S.Ct. 1002, 1009, 38 L.Ed. 936 (1894) ("[I]n cases of murder [where] the body is rarely, if ever, found, ... a more complete encouragement and protection for the worst offenses of this kind could not be invented than a rule of this strictness.").

One rationale provided for the "no-body-required" rule is that a murderer should not be entitled to acquittal simply because he successfully disposes of a victim's body. "That is one form of success for which society has no reward." *People v. Manson,* 71 Cal.App.3d 1, 42, 139 Cal.Rptr. 275, 298 (2nd Dist.1977), *cert. denied,* 435 U.S. 953, 98 S.Ct. 1582, 55 L.Ed.2d 803 (1978). Similarly, the "successful concealment or destruction of the victim's body should not preclude prosecution of his or her killer where proof of guilt can be established beyond a reasonable doubt." *State v. Zarinsky,* 143 N.J.Super. 35, 55, 362 A.2d 611, 621 (1976), *aff'd* 75 N.J. 101, 380 A.2d 685 (1977).

As our research has indicated, the "no-body-required" rule has steadfastly held in a variety of first degree murder convictions based entirely on circumstantial evidence. In *State v. Nicely,* 39 Ohio St.3d 147, 529 N.E.2d 1236 (1988), for example, the evidence showed that the defendant, who made no admission, had a stormy marriage with his wife and that she had announced her intention of leaving him the night of her disappearance. Subsequent investigations showed human blood of the victim's type on the defendant's pants and other items as well as in and around the victim's car, which the defendant had abandoned. In contrast, in *State v. Zarinsky,* 143 N.J. Super., 362 A.2d 611, the defendant was a stranger to the 17–year–old victim that he had lured into his car. No physical evidence of the victim's presence could be linked to the defendant apart from some of the victim's possessions (such as hairclips) that were found in his car. However, the defendant stated to cellmates that the victim would never be found because he had thrown her body into a river. Moreover, four witnesses testified to seeing the victim in the defendant's car.

■■■ In general, our review has shown a wide range in the types of relationships between defendants and victims, in addition to defendants' personal histories and motives and the extent of circumstantial evidence admitted into trial to support a jury verdict. Consistent with prior case law, we hold that neither the body of the missing person nor evidence of the method used to produce death is required to establish the corpus delicti or to sustain a murder conviction. *See People v. Scott,* 274 Cal.App.2d 905, 79 Cal.Rptr. 587 (2nd Dist.1969).

### C.

In this case, the government sought to prove the corpus delicti for first degree murder by introducing evidence based on the testimony of many different witnesses. In line with our jurisprudence for reviewing the denial of a motion for a judgment of acquittal, we note that such evidence need not "be inconsistent with every conclusion save that of guilt if it establishes a case from which the jury can find the defendant guilty beyond a reasonable doubt." *United States v. Leon,* 739 F.2d 885, 891 (3d Cir.1984) (citing *United States v. Allard,* 240 F.2d 840, 841 (3d Cir.), *cert. denied,* 353 U.S. 939, 77 S.Ct. 814, 1 L.Ed.2d 761 (1957)); *United States v. Cooper,* 567 F.2d 252, 253 (3d Cir.1977) (referring to the *Glasser* and *Allard* standards of reviewing evidence). Any failure by the prosecutor in meeting this standard must be "clear." *Leon,* 739 F.2d at 891 (citing *Burks v. United States,* 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1977)).

---

**14.** See *State v. Zarinsky,* 143 N.J.Super. 35, 362 A.2d 611 (1976) (defendant stated to cellmates that 17 year-old victim, a stranger, would never be found and that he had thrown victim's body into a river; defendant was a suspect in the death of other teen-age girls and had previously tried to lure girls into his car; four witnesses saw in defendant's car; some of victim's possessions (hairclips) were found in defendant's car; victim last seen with defendant), *aff'd,* 75 N.J. 101, 380 A.2d 685 (1977).

In *People v. Bolinsky,* 260 Cal.App.2d 705, 67 Cal.Rptr. 347 (4th Dist.1968), the court emphasized that the evidence need not negate alternative explanations of the victim's disappearance, only that occurrence of the victim's death could be "reasonably inferred."

> The presence or absence of a particular item of evidence is not controlling. The question is whether from all the evidence it can reasonably be inferred that death occurred and that it was caused by a criminal agency.... The foundational evidence necessary to establish corpus delicti need not eliminate possible noncriminal explanation of the victim's disappearance.... The foundation may be laid by the introduction of evidence which creates a reasonable inference that the death could have been caused by a criminal agency, even in the presence of an equally plausible noncriminal explanation of the event.

*Id.* at 716, 67 Cal.Rptr. at 354 (citation omitted).

▆ Viewing all the evidence in the light most favorable to the government and the corresponding inferences to be drawn, we hold that the evidence was sufficient to be admitted and for a rational trier of fact to have found Harris guilty of first degree murder beyond a reasonable doubt. We base our decision on the following evidence.

Mrs. Harris left St. Kitts on August 14, 1989 and arrived safely that same day at the Cyril E. King Airport in St. Thomas, Virgin Islands. There was evidence that Mr. Harris was at the airport waiting for Mrs. Harris's arrival. An eye witness testified that she met and spoke with Mrs. Harris directly after she had deplaned and that Mrs. Harris had asked her whether Mr. Harris was present. The witness informed her that Mr. Harris was in the waiting area where the witness had spoken with him earlier. Mr. Harris later questioned the eye witness about whether she had seen him at the airport with his ex-wife. A friend of Mr. Harris's also testified that on August 14, 1989, Mr. Harris drove him to the entrance of the airport after having seen him walking on the highway.

No one has seen nor heard from Mrs. Harris since her arrival at the airport, and the police found no evidence that she left St. Thomas. The police also found no evidence of Mrs. Harris's whereabouts in their search for her at the airport through missing person flyers, in their notice in the Virgin Island Daily News, or in their search at St. Kitts. Apart from two instances in the past where it appeared that Mrs. Harris was avoiding her husband, she regularly maintained contact with her children, other family, and friends.

Mrs. Harris's disappearance was inconsistent with her future plans and obligations. Mrs. Harris was carrying packages from St. Kitts that she had planned to deliver to various persons in St. Thomas. Instead, Mr. Harris delivered those packages. Mrs. Harris also told her daughter that she was going to St. Thomas to work and that she intended to purchase certain items for her children still living in St. Kitts.

There was evidence that Mrs. Harris had been at Mr. Harris's apartment after she arrived at the airport. Mr. Harris told Detective Fraser that he had picked up his wife at the airport and taken her to the apartment. Moreover, Mrs. Harris's Hawaiian pants and underwear that her daughter had packed in her suitcase in St. Kitts were observed by Raphello Harris, Jr. at his father's apartment approximately one week after Mrs. Harris's arrival. Raphello Harris, Jr. could not find the pants or underwear, however, when he later returned.

Mr. Harris's behavior was unusual on August 14, 1989. Raphello Harris, Jr. testified that his father left the jobsite for the stated purpose of buying supplies although he never returned to the site later that day as he had promised. When Raphello Harris, Jr. showed up at his apartment, his father was sweating heavily, looked as though he had been crying, and appeared to be in the process of mopping the floor. Raphello Harris, Jr. also thought it unusual

for his father to remain seated on the bed in the apartment as he dressed for work.

Blood was observed in Mr. Harris's apartment. Raphello Harris, Jr. testified that he saw blood on Mr. Harris's pants on August 14, 1989. When he returned to the apartment several days later, he smelled blood and discovered blood on the bathroom wall, the shower curtain, and in the storage area of the bed. Moreover, the bloodstained bottom portion of the bed that Raphello Harris, Jr. had observed initially was removed and a fresh bottom inserted when he subsequently returned with the police. The FBI's tests showed that a number of items in the apartment contained human blood.

Mr. Harris made highly incriminating statements to his children, to Detective Fraser, and to others. In a conversation with Detective Fraser, Mr. Harris admitted picking his wife up at the airport, taking her to his apartment, and holding a knife to her throat while questioning her about her relationship with another man. The next thing he knew he had killed her. Mr. Harris also told Raphello Harris, Jr. that Mrs. Harris would never be found because she "had left here in fifteen pieces."

Mr. Harris had a history of verbal threats and violence toward Mrs. Harris. On one or more occasions in St. Kitts, Mr. Harris had told his wife that he would not kill her there because the laws in St. Kitts were too tough. Witnesses also testified that in 1984, Mr. Harris had tried to strangle his wife, that he had stabbed her with a knife on another occasion, and that he had committed other acts of physical abuse from 1982 to 1985. The most recent incident was a heated quarrel in July, 1989.

We note that comparable types of evidence have been found significant in prior "no-body-required" case law, including: (1) presence of blood or bloodstains at the site of the murder, *see, e.g., People v. Cullen,* 37 Cal.2d 614, 234 P.2d 1 (1951); *People v. McMonigle,* 29 Cal.2d 730, 177 P.2d 745 (1947); *People v. Faulkner,* 186 Ill.App.3d 1013, 134 Ill.Dec. 683, 542 N.E.2d 1190 (1989); (2) presence of blood on the defendant's pants, *see, e.g., State v. Nicely,* 39 Ohio St.3d 147, 529 N.E.2d 1236 (1988); *Arnold v. State,* 803 P.2d 1145 (Okla.Crim. 1990); (3) attempts to remove blood or bloodstains through cleaning or sanding, *see, e.g., Cullen,* 37 Cal.2d 614, 234 P.2d 1; *State v. Lung,* 70 Wash.2d 365, 423 P.2d 72 (1967); (4) defendant's statements about "cutting up" the body in pieces, *see, e.g., People v. Manson,* 71 Cal.App.3d 1, 139 Cal.Rptr. 275 (2nd Dist.1977), *cert. denied,* 435 U.S. 953, 98 S.Ct. 1582, 55 L.Ed.2d 803 (1978); *People v. Curro,* 161 A.D.2d 784, 556 N.Y.S.2d 364 (2d Dept), *appeal denied,* 76 N.Y.2d 855, 560 N.Y.S.2d 994, 561 N.E.2d 894 (1990); *Commonwealth v. Burns,* 409 Pa. 619, 187 A.2d 552 (1963); (5) history of an unstable, stormy, or violent relationship between defendant and victim-wife, *see, e.g., People v. Modelski,* 164 Mich.App. 337, 416 N.W.2d 708 (1987), *appeal denied,* 1987 WL 24489, 1988 Mich. LEXIS 836 (1988); *Nicely,* 39 Ohio St.3d 147, 529 N.E.2d 1236; *Rawlings v. State,* 740 P.2d 153 (Okla.Crim.1987); (6) defendant's statements concerning victim-wife's alleged infidelity, *see, e.g., People v. Modelski,* 164 Mich.App. 337, 416 N.W.2d 708, or relationships with other men, *see, e.g., State v. Rebeterano,* 681 P.2d 1265 (Utah 1984); (7) evidence that the victim was a caring mother who was thought unlikely to leave her children, *see, e.g., State v. Hicks,* 495 A.2d 765 (Me.1985); (8) defendant's relief or satisfaction at the victim-wife's disappearance, *see, e.g., People v. Scott,* 176 Cal.App.2d 458, 1 Cal.Rptr. 600 (2nd Dist.1959), *cert. denied,* 364 U.S. 471, 81 S.Ct. 245, 5 L.Ed.2d 222 (1960); and (9) evidence of an extensive search to find the victim, *see, e.g., Commonwealth v. Smith,* 523 Pa. 577, 568 A.2d 600 (1989), *later appealed,* —— Pa.Super. ——, 591 A.2d 730 (1991) (nationwide FBI search).

In most of the cases we reviewed, the court emphasized the defendant's admissions or statements, the victim's normal mental and physical health to negate any suggestion that the disappearance was due to a suicide or natural causes, as well as the victim's failure to maintain habits and regular contact with family and friends, or attendance at work, planned engagements, and activities. *See, e.g., Hurley v. State,*

60 Md.App. 539, 483 A.2d 1298 (1984) (disruption of habit evidence is "essential" where no body is found).

We find particularly significant the disruption of Mrs. Harris's habits and plans, such as her promise to deliver packages upon her arrival at St. Thomas as well as her failure to maintain regular contact with family members and friends. This evidence negates the possibility that Mrs. Harris may have abandoned her family.

Worldwide communication and travel today are so facile that a jury may properly take into account the unlikelihood that an absent person, in view of his health, habits, disposition and personal relationships would voluntarily flee, "go underground," and remain out of touch with family and friends. The unlikelihood of such a voluntary disappearance is circumstantial evidence entitled to weight equal to that of bloodstains and concealment of evidence.

*Epperly v. Commonwealth,* 224 Va. 214, 228–29, 294 S.E.2d 882, 890 (1982) (citing *Regina v. Onufrejczyk,* 1 Q.B. 388 (1955) (stating that in modern times there is less rationale for strictness in the proof that a dead body exists as compared to two centuries ago where a person who travelled or left an area would be less able to communicate) (citing 2 M. Hale, *Pleas of the Crown* 290 (1736)).

Given the testimony presented and the inferences that can be drawn, we conclude there was sufficient evidence to support the district court's denial of Mr. Harris's motion for a judgment of acquittal and for the jury's verdict of first degree murder. Furthermore, we believe there was sufficient circumstantial evidence to support the jury's verdict apart from any admissions or statements made by Mr. Harris.

### D.

■ Mr. Harris contends that there was inadmissible or insufficient evidence to support the jury's verdict of possession of a

dangerous weapon during the commission of a crime of violence [15] because there was only "a brief reference to a weapon during the entire trial." He maintains that this reference was based solely on his allegedly uncorroborated admission to Detective Fraser on September 8 that a knife confiscated by police investigators was not the knife he used to kill his ex-wife.

We disagree. Although the alleged murder weapon was never recovered, Mr. Harris's statements concerning the means he used to kill his ex-wife are corroborated by circumstantial evidence that there was a homicide and that he was the perpetrator. For example, Mr. Harris's statement to Detective Fraser that he went to the airport to pick up his ex-wife is corroborated by an eyewitness who spoke with him there. Raphello Harris, Jr.'s testimony concerning what appeared to be blood on his father's pants and the subsequent finding of human bloodstains on a number of the items in Mr. Harris's home corroborated his statements to Detective Fraser that he held a knife to his wife's throat and killed her. Furthermore, Mr. Harris's statement to his son that his ex-wife would never be found because she "left in fifteen pieces" demonstrated a knowledge of details of the crime not revealed by anyone else and the means by which the crime was committed. *See, e.g., United States v. Felder,* 572 F.Supp. 17, 22 (E.D.Pa.), *aff'd,* 722 F.2d 735 (corroboration may be established by providing facts that would be unknown to any one else but the perpetrator). Thus, we conclude that Mr. Harris's statement to Detective Fraser was corroborated by "substantial independent evidence which would establish the trustworthiness of the statement." *Opper v. United States,* 348 U.S. 84, 93, 75 S.Ct. 158, 164, 99 L.Ed. 101 (1954).

We also note that we have sustained convictions of first degree murder and possession of a weapon on similar types of circumstantial evidence. *See, e.g., Govern-*

---

15. Under V.I.Code Ann. tit. 14, § 2251(a)(2), the government must prove:
 (1) The defendant possessed a dangerous or deadly weapon;

(2) The defendant intended to use the weapon unlawfully against another;
(3) The defendant possessed the weapon during the commission of a crime of violence.

ment of the Virgin Islands v. Rosado, 699 F.2d 121, 126 (3d Cir.) (evidence presented by various witnesses could sustain the defendant's convictions of first degree murder and possessing a firearm during the commission of a crime of violence), cert. denied, 464 U.S. 832, 104 S.Ct. 113, 78 L.Ed.2d 114 (1983); see also Government of the Virgin Islands v. Commissiong, 706 F.Supp. 1172, 1183–84 (D.C.V.I.1989). As we have documented, in most "no-body-required" state law cases, no weapon is ever recovered and the means of producing death cannot be definitely determined. In People v. Scott, 274 Cal.App.2d 905, 79 Cal.Rptr. 587 (2nd Dist.1969), for example, the defendant made various incriminating statements about his wife's disappearance, including an admission to his stepson that he had shot his wife in the back of the head. Further testimony indicated that he had buried a large, heavy box on the day of his wife's disappearance. However, no box or weapon were ever recovered. See also State v. Hicks, 495 A.2d 765 (Me.1985) (sustaining murder conviction although no weapon, bloodstains, or evidence of a struggle or means of death were found after wife's disappearance and defendant made no admission).

▐ In this case, then, we hold that there was "substantial independent evidence" to present the weapons charge to the jury and to support the verdict. Moreover, this determination comports with our holding that evidence of the means used to produce death need not be shown to sustain a murder conviction.

### E.

Mr. Harris contends that the district court erred when it admitted evidence of his prior acts because they were too remote in time, they occurred in another country, and they were unduly prejudicial under Fed.R.Evid. 403. Fed.R.Evid. 404(b) permits evidence of other acts in order to prove motive or intent.

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Fed.R.Evid. 404(b).

▐ We have held that Fed.R.Evid. 404(b) generally prohibits evidence of extrinsic acts that are intended to show a defendant's propensity for crime or to suggest pejorative inferences that may reflect upon a defendant's character. United States v. Scarfo, 850 F.2d 1015, 1018–19 (3d Cir.), cert. denied, 488 U.S. 910, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988); see also Government of the Virgin Islands v. Toto, 529 F.2d 278, 283 (3d Cir.1976) (stating our refusal "to admit evidence of prior criminal acts which has no purpose except to infer a propensity or disposition to commit crime"). We have recognized, however, that relevant evidence that could possibly harm the defendant is not inadmissible solely because of its potentially negative effects. If offered for a proper purpose and for a material issue apart from character under Fed.R.Evid. 404(b), other-acts evidence is subject only to the typical limitations under Fed.R.Evid. 402 and 403. Scarfo, 850 F.2d at 1019 (citing Huddleston v. United States, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988)).

▐ In view of these considerations, the Supreme Court has provided guidance to admit evidence under Fed.R.Evid. 404(b). The other-acts evidence must: (1) have a proper purpose; (2) be relevant; (3) have a probative value that outweighs its potential for unfair prejudice; and (4) be accompanied by a court's charge to the jury to consider it only for the limited purpose for which it is being admitted. Huddleston v. United States, 485 U.S. 681, 691–92, 108 S.Ct. 1496, 1501–02, 99 L.Ed.2d 771 (1988).

The drafters intended that Fed.R.Evid. 404(b) be construed as a rule of "inclusion" rather than one of "exclusion" in order to emphasize the admissibility of other-acts evidence. United States v. Long, 574 F.2d 761, 766 (3d Cir.), cert. denied, 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978); see also United States v. Pungitore, 910

F.2d 1084, 1149–50 (3d Cir.1990) (admitting a taped conversation to show the relationships among co-conspirators), *cert. denied,* — U.S. ——, 111 S.Ct. 2009, 114 L.Ed.2d 98 (1991); *United States v. O'Leary,* 739 F.2d 135, 136 (3d Cir.1984) (admitting other-acts evidence to provide background information and parties' acquaintanceship), *cert. denied,* 469 U.S. 1107, 105 S.Ct. 782, 83 L.Ed.2d 776 (1985); *United States v. Simmons,* 679 F.2d 1042, 1050 (3d Cir.1982) (admitting other-acts evidence occurring before the crime at issue to establish background information and a continuing relationship between the defendants), *cert. denied,* 462 U.S. 1134, 103 S.Ct. 3117, 77 L.Ed.2d 1370 (1983); *see also United States v. Jordan,* 722 F.2d 353, 356 (7th Cir.1983) (referring to the various circuits that have admitted evidence of prior bad acts when those acts have explained the circumstances, background, or development of the crime charged, or "completed the story of the crime on trial").

■ Apart from meeting the standard of Fed.R.Evid. 404(b), however, other-acts evidence must be also be evaluated against the unfair prejudice standard of Fed.R. Evid. 403. Thus, a court may exclude logically relevant other-acts evidence if its probative value is substantially outweighed by the risk of undue prejudice. *Scarfo,* 850 F.2d at 1019; *United States v. Driggs,* 823 F.2d 52, 54 (3d Cir.1987). We have emphasized, however, the need for "judicial restraint" when an appellate court is reviewing a trial court's Rule 403 analysis. *Long,* 574 F.2d at 767. *See e.g., United States v. Dansker,* 537 F.2d 40, 58 (3d Cir.1976) (upholding district court's admission of other-acts evidence describing a relationship between the witness and the defendants), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

■ We believe that the district court properly admitted evidence of Mr. Harris's prior acts, particularly his history of violence toward Mrs. Harris. Testimony about Mr. Harris's attempts to strangle and stab Mrs. Harris were highly probative in demonstrating his motive and intent as well as establishing that his wife's death

was not accidental or suicidal. Moreover, Mr. Harris's statements that he would kill Mrs. Harris in a place other than St. Kitts were probative of Mr. Harris's intent, preparation, and the development of the crime charged. It also tended to prove that Mrs. Harris did not simply disappear from the area voluntarily.

Our primary inquiry, then, is whether the other-acts evidence "is probative of a material issue other than character." *Huddleston v. United States,* 485 U.S. at 686, 108 S.Ct. at 1499. We agree with the district court that the other-acts evidence was relevant, probative of many proper purposes, and not unfairly prejudicial. We find no abuse of discretion under Rule 403.

## V. CONCLUSION

We will affirm the district court's denial of Mr. Harris's motion for acquittal. We hold that there was sufficient evidence to establish the corpus delicti for the jury's verdict of murder in the first degree and of possession of a dangerous weapon during the commission of a crime of violence. Moreover, the district court properly admitted evidence of Mr. Harris's past acts of violence toward the victim.